**Herbert F. McGILL, Plaintiff,**

v.

**Jack R. DUCKWORTH, et al., Defendants.**

**No. S85–70.**

United States District Court, N.D. Indiana, South Bend Division.

Nov. 30, 1989.

has "no knowledge of the existence of an inactive roll."

Donald W. Pagos, Michigan City, Ind., for plaintiff.

David Arthur, Thomas Quigley, Deputy Attys. Gen., Indianapolis, Ind., for all defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

On September 28, 1989, following four days of trial, a jury returned a verdict in favor of plaintiff Herbert F. McGill and against defendants Jack R. Duckworth, Robert Bronnenberg, and Brian Webb. Judgment was entered against those defendants the following day. The cause is now before the court on those defendants' motion for judgment notwithstanding the ver-

1145

dict, for new trial, or for amendment of judgment.

Mr. McGill's evidence indicated that while he was an inmate at the Indiana State Prison, he was placed on "protective custody" in a cell on "IDU", a unit primarily used to house inmates assigned there for disciplinary purposes. Shortly after his assignment to IDU, Mr. McGill was sodomized at knifepoint in the shower by fellow inmate Arthur Ausley. He brought this suit against these defendants and others. He claimed, among other things [1], that the defendants violated his Eighth Amendment right to be free from cruel and unusual punishment and so were liable to him under 42 U.S.C. § 1983. He also claimed that the defendants were negligent toward him and so were liable to him under Indiana's Tort Claims Act, IND.CODE 34-4-16.5-1 et seq. The jury found for Mr. McGill on both claims and awarded him compensatory damages but no punitive damages.

The defendants raise several arguments in support of their motion for judgment notwithstanding the verdict. They contend that the evidence was insufficient to establish a violation of the Eighth Amendment and make six points in support of that argument. They contend further with respect to the Eighth Amendment claim that the evidence was insufficient to establish any causal connection between their acts or omissions and Mr. McGill's injuries and make four points in support of that argument. They argue that the evidence was insufficient to support Mr. McGill's state negligence claim and make four points in support of that argument. They raise four arguments for immunity under Indiana's Tort Claims Act.

In support of their motion for a new trial, the defendants raise several arguments concerning the court's evidentiary rulings and jury instructions. Finally, the defendants argue that the judgment should be amended to avoid a double recovery for the plaintiff.

The court first addresses the motion for new trial, then turns to the motion for judgment notwithstanding the verdict, and finally to the motion to amend the judgment.

### I.

In their motion for a new trial, the defendants challenge an evidentiary ruling, reference to an Indiana statute, and three final instructions.

### A.

At the trial's outset, the court granted Mr. McGill's motion *in limine* concerning the defendants' intent to offer evidence that Mr. McGill previously had engaged in homosexual activity. The defendants argued then, as they do now, that such evidence would be admissible on the issues of consent and damages, explaining that "[i]t was offered to rebut a natural presumption, based on every day experience, that a given man would never consent to homosexual acts" and "to show that Plaintiff may not have suffered the mental anguish from a homosexual experience that would be experienced by a man with no consensual homosexual experience." Defendants' Memorandum in Support of Post–Trial Motions, at 2–3.

■ The defendants' motion does not identify the excluded evidence, but it is the court's recollection that during Mr. McGill's guilty plea to state manslaughter charges or in his confession with respect to the homicide, he admitted that he had engaged in an act of oral sex with his male victim. The record does not include Mr. McGill's confession or guilty plea proceedings, but it appears that an order *in limine* is reviewable on appeal without an in-trial offer of proof. *Harris v. Davis*, 874 F.2d 461, 464 n. 5 (7th Cir.1989) ("In this circuit, however, an unsuccessful motion in limine serves to preserve an issue for appeal.").

■ The court remains convinced that exclusion of the evidence was proper. Fed-

---

**1.** Mr. McGill also claimed that the defendants had violated his due process rights by placing him in the detention unit. The court granted

the defendants' motion for directed verdict on that claim at the conclusion of the plaintiff's evidence in chief.

eral Rule of Evidence 404(b) governs civil cases as well as criminal cases.[2] *Harris v. Davis,* 874 F.2d 461 (7th Cir.1989). The Seventh Circuit has established a four-part test that must be satisfied for evidence of other acts to be admissible under Rule 404(b). *United States v. DeGeratto,* 876 F.2d 576, 584–585 (7th Cir.1989); *United States v. Shackleford,* 738 F.2d 776, 779 (7th Cir.1984).

1. The evidence must be addressed to some matter in issue other than propensity to commit such acts. Rule 404(b) provides that, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." The defendants' proffered use of the evidence on the issue of consent would seek to create the precise inference forbidden by Rule 404(b): Mr. McGill is the sort of person who engages in consensual homosexual activity because he did it before, so he must have done it this time. In other words, Mr. McGill acted in conformity with his character, which entails consensual homosexual activity. *See generally United States v. Beasley,* 809 F.2d 1273, 1277–1279 (7th Cir.1987) (discussing "pattern" evidence).

The second sentence of Rule 404(b) sets forth other purposes for which "other act" evidence may be admissible, such as proof of motive[3], opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evidence of Mr. McGill's homosexual history would not have served any of these purposes.

2. The other act must be similar enough, and close enough in time, to the act in issue to be probative. The prior act was similar insofar as it entailed sexual activity between males, but the defense did not suggest that the prior act involved anal intercourse. Moreover, it is questionable whether a single prior sexual act, whether

homosexual or heterosexual, is probative of later willingness to engage in sexual conduct with another. *See* Note, *If She Consented Once, She Consented Again—A Legal Fallacy in Forcible Rape Cases,* 10 Val.U.L.Rev. 127 (1976) ("giving away sex has no more in common with rape than giving away money has in common with armed robbery").

3. The evidence of the other act must be sufficient to allow the trier of fact to find that Mr. McGill engaged in the prior act. *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). Because the defendants sought to introduce Mr. McGill's statements at his guilty plea, this requirement would have been satisfied.

4. Finally, the probative value of the evidence must outweigh the danger of unfair prejudice. As noted above, the evidence has little or no permissible probative value on the issue of consent. Unless Mr. McGill claimed a loss of virginity, it is difficult to see how the proffered evidence would have been probative on the issue of damages. At the time of the order *in limine,* the court indicated that it would reconsider the order if Mr. McGill raised such a claim. The defendants now argue that Mr. McGill did so in his final argument. The proper remedy would have been to strike the argument and instruct the jury to disregard it, but the defendants made no objection to any such indirect assertion. Accordingly, the court deems it inappropriate to consider that argument.

The defendants' proffered evidence would have done nothing more than portray Mr. McGill as a person to whom the jury should accord lesser respect because of his past act of homosexuality. Based on the other evidence presented at trial, the prior act would not have been probative of any permissible inference. Any permissi-

---

**2.** The parties also have discussed the impact of Federal Rule of Evidence 412. Because this is not a criminal case, that Rule does not apply.

**3.** In *Hernandez v. Cepeda,* 860 F.2d 260, 265 (7th Cir.1988), a § 1983 suit for use of unreasonable force in arrest, the court held that the defendant police officer could show that the plaintiff was

being arrested for rape and aggravated kidnapping, to show the plaintiff's motive to resist arrest. The defendants here did not argue that Mr. McGill's prior homosexual activity gave him a motive to engage in it again. Such an argument would eradicate the line between "propensity" evidence and "motive" evidence.

ble probative value that might be attributed to the prior act would have been so slight as to have been dwarfed by the potential for unfair prejudice.

The defendants argue that the order *in limine* deprived them of the opportunity to present their defense that the act between Ausley and Mr. McGill was consensual. The court did not exclude the defense; indeed, Dr. Doster's testimony can only be viewed as raising an inference that consensual sexual contact left the medical evidence upon which Mr. McGill relied. The order *in limine* simply deprived the defendants of evidence barred by Rule 404(b).

### B.

The defendants argue that, "During Plaintiff's case, the Court read to the jury Ind.Code § 11–11–6–1 and instructed the jury that violation of that section 'may be negligence.'" The defendants' recollection of the trial is inaccurate. At the outset of the second day of trial, Mr. McGill's counsel asked the court to take judicial notice of IND.CODE 11–11–6–1(a), and the defense objected on the grounds raised here. The court granted the request for judicial notice and read the statute to the jury. The court did not, however, instruct the jury that violation of the statute may be negligence.[4] Before and after reading the statute to the jury, the court informed the jury that state statutes do not set federal constitutional standards and that the final instructions would inform the jury as to the standards governing Mr. McGill's federal claims.

The statute was pertinent to the evidence before the jury and to the plaintiff's claims as they then stood. Mr. McGill based his Eighth Amendment claim in part on a "reign of terror" theory[5] first articulated in *Woodhous v. Commonwealth of Virginia*, 487 F.2d 889 (4th Cir.

1973). Mr. McGill attempted to demonstrate a "reign of terror" by use of statistics maintained by the Indiana Department of Correction. The defendants' testimony demonstrated the inefficiency of those records. Robert Bronnenberg testified that the best records of violence at the prison would be found in the 2,000 separate inmate packets; they are not otherwise compiled. The information provided to the plaintiff came from investigators' log books; Jack Duckworth testified that those records would disclose only allegations and would not reflect the actual incidence of violence.

IND.CODE 11–11–6–1(a)(4) specifically required the Indiana Department of Correction to maintain accurate records regarding incidents of violence. That statute, and the methods actually used, were directly pertinent to Mr. McGill's ability to make a statistical showing of the "reign of terror" he claimed to exist at the prison. No error was committed in taking judicial notice of the statute and informing the jury of its provisions.

### C.

The defendants complain of the giving of Instructions 21–23. Those instructions, together with Instruction No. 20, informed the jury that:

#### 20.

Under the Eighth Amendment, a prison official can be found liable for failing to protect a prison inmate from an attack by another offender only if that official acts with "deliberate indifference". To prove "deliberate indifference", the plaintiff, Herbert McGill, must prove by a preponderance of the evidence that a defendant prison official intentionally or recklessly disregarded a substantial risk of danger that was known to him or

---

**4.** Mr. McGill tendered a proposed final instruction that would have told the jury that if it were to find that any defendant violated the statute, the jury "must find as a matter of law that the Defendant was negligent." Plaintiff's Tendered Instruction No. 44. The court declined to give the instruction.

**5.** As the trial went on, this theory disappeared from the case. The court gave no instruction on this theory, and no objection was raised to the failure to so instruct. The jury was instructed on more traditional Eighth Amendment theory.

would have been readily apparent to a reasonable person his position.

An act is done intentionally if it is done knowingly, that is if it is done voluntarily and deliberately and not because of mistake, accident, negligence, or other innocent reason.

### 21.

A defendant acts with "deliberate indifference" when he knows of the danger or where the threat of violence is so pervasive that his knowledge may be inferred, yet he fails to enforce a policy or take other reasonable steps which may have prevented the harm. A defendant acts recklessly or with "reckless disregard" when he disregards a substantial risk of danger that either is known to him or would be apparent to a reasonable person in his position.

### 22.

Accordingly, to prove his claim that he was subjected to cruel and unusual punishment, the plaintiff must establish, by a preponderance of the evidence, the following:

First: that the defendant or defendants knew, or should have known, that the plaintiff had been threatened with violence or sexual assault and that it was highly foreseeable that the plaintiff would be physically or sexually assaulted by another inmate; and

Second: that the defendant or defendants were deliberately indifferent to the plaintiff's constitutional right to be free from cruel and unusual punishment, either because the defendant or defendants intended to deprive him of some right or because they acted with reckless disregard of his right to be free from violent or sexual assaults by fellow inmates; and

Third: that such acts violated the plaintiff's right to be free from cruel and unusual punishment; and

Fourth: that the conduct of the defendant or defendants was the proximate cause of injury and consequent damage to the plaintiff.

If you find that the plaintiff has proved each of these propositions against any of the defendants, then you should find in favor of the plaintiff and against that defendant or those defendants.

If you find that the plaintiff has failed to prove each of these propositions against any of the defendants, then you should find in favor of that defendant or those defendants and against the plaintiff as respects that defendant or those defendants.

### 23.

The means of knowledge are ordinarily the equivalent in law to knowledge. So, if it appears from the evidence in the case that a person had information which would lead a reasonably prudent person to make inquiry through which he would surely learn certain facts, then this person may be found to have had actual knowledge of those facts, the same as if he made such inquiry and had actually learned such facts.

That is to say, the law will charge a person with notice and knowledge of whatever he would have learned upon making such inquiry as it would have been reasonable to expect him to make under the circumstances.

Knowledge or notice may also be established by circumstantial evidence. If it appears that a certain condition has existed for a substantial period of time and that the defendant or defendants had regular opportunities to observe the condition, then you may draw the inference that the defendant or defendants had knowledge of the condition.

The defendants challenge the objective nature of the inquiry allowed by these instructions. Phrases such as "or should have known" and concepts such as the inquiry that would have been reasonable under the circumstances, the defendants argue, have no place in Eighth Amendment jurisprudence. Indeed, the defendants contend that Instruction No. 23 effectively overruled *Duckworth v. Franzen,* 780 F.2d 645, 653 (7th Cir.1985), *cert. denied* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).

■ Without question, a certain tension is inescapable when language from one Eighth Amendment case is aligned against language from another, different case. Such a tension, while challenging at times, should be unsurprising, for language appropriate to explain the holding in one case may be inappropriate in explaining another. Recognizing this, the court believes that the jury was instructed in accordance with law.

In *Benson v. Cady,* 761 F.2d 335 (7th Cir.1985), the court affirmed dismissal of an inmate's complaint for failure to state a claim upon which relief can be granted. In the course of its ruling, the court reviewed the standards governing Eighth Amendment claims:

> It has long been established, however, that negligence, evidenced by, *inter alia,* simple inattention or inadvertence, may not form the basis for an eighth amendment claim.... A plaintiff must prove deliberate indifference, evidenced by either actual intent or reckless disregard.... Although the term "actual intent" is self-explanatory, reckless disregard is not. A defendant acts recklessly when he disregards a substantial risk of danger *that either is known to him or would be apparent to a reasonable person in his position.* Recklessness is characterized by highly unreasonable conduct or a gross departure from ordinary care in a situation where a high degree of danger is apparent.... *The standard is an objective one....* Although *subjective awareness of the risk is no defense,* the risk must be foreseeable. Indeed, risk is defined as a recognizable danger of injury.... The risk also must be substantial.

761 F.2d at 339 (emphasis added; citations omitted). *Benson v. Cady,* then, supports the inclusion of some objective standard in determining recklessness.

The defendants cite cases decided since *Benson v. Cady* which appeared to cast doubt on the continuing vitality of that objective standard. In *Duckworth v. Franzen,* 780 F.2d 645, a case that did not involve protection of inmates from assault by other inmates, the court offered an explanation and illustration that seemed to retreat from the possibility of an objective standard encompassing constructive knowledge:

> For example, if a prisoner tells the prison doctor that he is allergic to penicillin, but the doctor injects him with penicillin anyway and the prisoner has a severe reaction, the doctor is guilty of having inflicted a cruel and unusual punishment ... But if before injecting him the doctor merely fails to tell the prisoner what is in the syringe, and thus gives the prisoner no chance to alert him to a possible (and quite common) allergy, the doctor is not guilty of violating the Eighth Amendment even if it is a palpable act of medical malpractice to inject someone with penicillin without first asking whether he is allergic.... In the first case the doctor knows there is a great danger, could avert it at trivial cost (though greater than in the case of reckless murder that we gave earlier), but instead ignores it. In the second case the doctor should know there is some danger, but he is inadvertent. Although it is conceivable if improbable that his inadvertence would be deemed unreasonable enough—given the trivial burden of inquiry—to make his conduct relevant in a tort sense, *punishment cannot be inadvertent. Punishment implies at a minimum actual knowledge of impending harm easily preventable,* so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.

780 F.2d at 653 (emphasis added; citations omitted). Even *Duckworth v. Franzen,* however, retained the concept of "recklessness", equating it to the criminal *mens rea* that "implies an act so dangerous that the defendant's knowledge of the risk can be inferred", 780 F.2d at 652, a point for which it was cited with apparent approval in *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986). The *Duckworth* court seemed to question the language from *Benson v. Cady* by citing it as among cases that "contain language more suggestive of the tort defini-

tion of recklessness than of the criminal law definition ..." 780 F.2d at 653.

Yet the language of *Benson v. Cady* survived. In *Richardson v. Penfold*, 839 F.2d 392, 394–395 (7th Cir.1988), the court articulated the standards as follows:

> The "reigning" law in this circuit under the eighth amendment states that a prison official will be liable for failing to protect an inmate from attacks if that official acts with "deliberate indifference." *Duckworth v. Franzen* ... Similarly, a prison official who acts with "deliberate or callous indifference" toward inmates violates the due process clause of the fourteenth amendment.... A plaintiff can show "deliberate indifference" by proving that the prison official acted with actual intent or recklessness.... "A defendant acts recklessly when he disregards a substantial risk of danger that either is known to him or would be apparent to a reasonable person in his position." *Benson v. Cady* ...

(some citations omitted).

Based on the foregoing, the court concludes that Instructions 21 through 23 accurately state the law applicable to this case,[6] which, like *Benson v. Cady* and *Richardson v. Penfold,* involved an assault by a fellow inmate. If *Richardson v. Penfold* did not overrule *Duckworth v. Franzen* (and it did not, and did not need to), neither did the instructions in this case. These instructions, like *Duckworth v. Franzen,* permitted liability for "reckless disregard" but not for "gross negligence". *See Walsh v. Mellas,* 837 F.2d 789, 794–795 (7th Cir.), *cert. denied* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). To hold, as the defendants apparently argue, that only actual knowledge can give rise to a finding of deliberate indifference, would reward prison officials for blinking risks of which they should be aware.

The court's instructions did not warrant a finding for the plaintiff simply because a defendant should have known of the risks

to Mr. McGill; Instruction No. 20 informed the jury that the defendant must have "intentionally or recklessly disregarded a substantial risk of danger" of which the defendant had actual or constructive knowledge. Viewed together, the court's instructions accurately stated the law governing Eighth Amendment claims arising from assaults by fellow inmates.

### D.

Accordingly, the court concludes that the defendants' motion for a new trial should be denied.

### II.

■ As noted above, the defendants move for judgment n.o.v., raising several arguments concerning sufficiency of the evidence and immunity under the Indiana Tort Claims Act. Mr. McGill challenges the defendants' right to raise these arguments, noting that while the defendants moved for a directed verdict at the close of his case-in-chief (and that motion was granted with respect to some claims and some defendants), they did not renew their motion at the close of all the evidence. Mr. McGill is correct that the defendants did not renew the directed verdict motion at the close of all the evidence. The court disagrees, however, that in light of this failure, Fed.R.Civ.P. 50(b) precludes the court from considering even part of the motion.

The Seventh Circuit has adopted an approach to such issues more flexible than that employed in some other circuits. *See Bonner v. Coughlin,* 657 F.2d 931, 938–939 (7th Cir.1981). In *Villenueva v. McInnis,* 723 F.2d 414 (5th Cir.1984), the defendant had informed the court and opposing counsel of the perceived shortcomings of the plaintiff's case in the motion made at the conclusion of the plaintiff's evidence and objected to the court's instructions on grounds of insufficiency of the evidence. The Fifth Circuit held the issue sufficiently

---

6. Indeed, the defendants' trial brief cited *Richardson v. Penfold* in support of the proposition that, "To find any defendant liable, the court must determine that he acted with actual intent that harm be inflicted or in disregard of 'a substantial risk of danger that either [was] known to him or would [have been] apparent to a reasonable person in his position.' "

preserved, citing *Bonner v. Coughlin* with approval.

So, too, did these defendants inform the court and Mr. McGill's counsel of at least some of the perceived inadequacies of Mr. McGill's evidence to support his federal claim.

In *McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1556 (7th Cir.1987), the court explained:

> The modern rationale for the rule that a motion for directed verdict is a prerequisite to judgment n.o.v. is that the opposing party should have a chance to rectify (or at least seek the court's leave to rectify) deficiencies in his evidence before it is too late, that is, before the case goes to the jury.

The defendants' motion (while not renewed) and objections to the instructions were sufficient to achieve this purpose with respect to some of the arguments they seek to raise now. But the court can consider only those points that were raised in the motion at close of the plaintiff's case-in-chief. As the *McCarty* court further explained:

> After both motions for directed verdict (the plaintiff's on contributory negligence, and the defendant's on negligence) were denied, the defendant had no reason to think it hadn't put in enough evidence to get to the jury on the issue of liability. If the plaintiff thought otherwise she had to move for a directed verdict on that issue.

826 F.2d at 1556.

Accordingly, to the extent the issues were presented at trial, the court will address the defendants' motion for judgment n.o.v. This case was tried too well to turn on an unimportant procedural misstep. The first order of business, however, must be to determine the extent to which the issues raised in the post-trial motion were raised in the in-trial motion.

As to the Eighth Amendment claim [7], the defendants argued at the close of Mr.

McGill's evidence that no deliberate indifference had been shown, because action was taken each time Mr. McGill requested a move for the sake of safety. The defendants argued that Mr. McGill had not shown that the move to IDU placed him in any particular danger, particularly from Ausley. The defendants noted that Mr. McGill had not informed anyone of his fear of Ausley, and neither Mr. McGill nor Ausley were identifiable categories that would put the defendants on notice of any heightened risk; accordingly, the defendants could have had no actual knowledge of the risk to Mr. McGill. The defendants did not, they argued, intentionally expose Mr. McGill to a known danger. Finally, the defendants argued, Mr. McGill had not made out a "reign of terror" case.

With respect to the pendent negligence claim, the defendants argued in their motion for directed verdict that while they had a duty to take reasonable steps to protect inmates, no breach of duty had been shown because they acted whenever Mr. McGill asked them to act. Only Mr. McGill knew of the threat by Ausley, and Mr. McGill told nobody. The defendants further argued that the injury of which Mr. McGill complained was not foreseeable because Mr. McGill presented no evidence that Ausley was an assaultive person or in any category that posed a threat to Mr. McGill. The defendants argued that IND.CODE 11–11–6–1(a), discussed above, did not apply to this case because it imposes duties on the state department, not on the defendants who were sued in their individual capacities; further, if it assumed that the policies required by statute were not adopted, Mr. McGill had not shown that the failure to adopt policies proximately caused his injuries; further, under Indiana's Tort Claims Act, the enforcement of, or failure to enforce a statute, is an affirmative defense. Finally, the defendants argued, training and supervision are discretionary

---

7. The court granted the defendants' motion for directed verdict with respect to Mr. McGill's due process claim, and, while the directed verdict motion was denied with respect to the punitive damages claims, the jury awarded no punitive damages. Accordingly, the court need only examine the defendants' arguments with respect to the Eighth Amendment claim and the state negligence claim.

functions, and they are immune from state tort liability for discretionary acts.

Following this review of the defendants' motion for directed verdict, the court concludes that the following portions of their j.n.o.v. may be considered under *Bonner v. Coughlin,* 657 F.2d 931: paragraphs 1(a)–(d), 2(a) & (c)–(d), 3, 4, 5, and 6. Under *McCarty v. Pheasant Run, Inc.,* 826 F.2d 1554, the court may not consider paragraphs 2(b), 7, 8, or 9 because the defendants did not place the plaintiff on notice of those asserted deficiencies in his case.[8]

### A.

To establish entitlement to judgment, the defendants must demonstrate that the evidence, when viewed in a light most favorable to the plaintiff, so overwhelmingly favors the defendants "that no contrary verdict could ever stand.... A standard different only in degree applies to motions for a new trial." *Simplex, Inc. v. Diversified Energy Systems, Inc.,* 847 F.2d 1290, 1294 (7th Cir.1988).

### 1.

In paragraphs 1(a)–(c) of their motion, the defendants argue that Mr. McGill's evidence affirmatively showed that no defendant had actual knowledge of any threat to Mr. McGill and that Mr. McGill presented no evidence showing that Ausley was (or should have been) known to be particularly aggressive or that Mr. McGill ever had been sexually attacked in any way before his transfer to the detention unit. The defendants also argue that Mr. McGill presented no evidence showing that he was exposed to a pervasive risk of harm while housed in the detention unit, but since the case was not submitted to the jury on a "reign of terror" theory, the court views this argument as being subsumed under the other two arguments.

Mere lack of due care in preventing an attack on an inmate does not give rise to liability under § 1983, *Jones v. Hamelman,* 869 F.2d 1023, 1031 (7th Cir.1989); *accord, Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), but if the attacks occur so frequently as to be pervasive, or if the inmate belonged to an identifiable group of individuals for whom the risk of attack was a serious problem of substantial dimensions, deliberate indifference may be inferred.

In *Meriwether v. Faulkner,* 821 F.2d 408, 417–418 (7th Cir.), *cert. denied* 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 269 (1987), the court held that a transsexual inmate's complaint stated a claim upon which relief can be granted when it alleged that the inmate had been assaulted even in administrative segregation; the court said that "given that she is a transsexual housed in an all-male prison, the risk of assault would appear to be sufficiently serious to require the defendants to take some minimal measures to protect her from assault".

In *Watts v. Laurent,* 774 F.2d 168, 173–174 (7th Cir.1985), *cert. denied* 475 U.S. 1085, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986), the court summarized the evidence as follows:

> ... each of the defendants was an eyewitness on at least one occasion to an explicit threat made against Watts by Greaves. Moreover, the evidence taken in a light most favorable to plaintiff established that in evaluating the potential seriousness of that threat each defendant was armed with the knowledge that Greaves was physically much larger than Watts, and that the two lived in the same cottage. Various testimony supported the inference that gang activity permeated the Youth Center and that Greaves

---

**8.** Paragraph 2(b) asserted that Mr. McGill presented no evidence that Ausley was serving disciplinary or administrative segregation (Charles Wright, however, testified that plaintiff's Exhibit 21 indicated that Ausley was at IDU for disciplinary segregation). Paragraphs 7 and 8 asserted that the defendants were performing discretionary acts and so were immune from state tort liability under IND.CODE 34–4–

16.5–3(6). Paragraph 9 asserted that each defendant was immune from state tort liability under IND.CODE 34–4–16.5–3(9) because the injury resulted from the act of another and that under IND.CODE 34–4–16.5–3(7) Mr. Duckworth and Mr. Bronnenberg were immune from state tort liability for adoption and enforcement of, or failure to adopt and enforce, a rule or regulation.

was a gang leader while Watts resisted joining any gang. The defendants were directly responsible for observing and supervising residents' behavior, and they were in almost daily contact with both Watts and Greaves. Under these circumstances we agree with the trial court that the evidence was sufficient to demonstrate that defendants ... knew there was a strong likelihood of an assault, and therefore the court did not err in refusing to grant a judgment notwithstanding the verdict.

In *Richardson v. Penfold*, 839 F.2d 392 (7th Cir.1988), the plaintiff-inmate reported a sexual assault to a guard named Dyer, but refused to identify his assailants. Dyer later allowed one of the assailants into the plaintiff's cell, along with another inmate, despite the plaintiff's pleas that Dyer not leave him alone with those two inmates; the plaintiff was raped again. He was raped still again two days later. The district court's grant of summary judgment to the defense was reversed on appeal. The court reasoned that the plaintiff had come forth with evidence to indicate that Dyer knew the assailants had raped other inmates. Further:

> Even if Dyer could not reasonably know that Birch raped Richardson the first time, a jury could reasonably conclude that he deliberately chose to allow Birch into Richardson's cell after Richardson had already reported one rape and begged Dyer to protect him from another. Based on Staggers's and Richardson's allegations, a jury could have reasonably found that Dyer had shown indifference to the rapes of Richardson or a willingness to allow the attacks after learning of a strong likelihood that Richardson would be raped.

839 F.2d at 396.

In *Walsh v. Mellas*, 837 F.2d 789 (7th Cir.), *cert. denied* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988), prison officials were held liable in a suit involving one inmate's attack on another. In an interesting wrinkle on the facts of the case at bar, the inmate in *Walsh* felt he would be safer in disciplinary segregation than in protective custody, and so refused a work assignment. In disciplinary segregation, however, inmates were double-celled; the prison placed Walsh in a cell with a gang-affiliated inmate over Walsh's objection, and Walsh was stabbed and strangled. The district court found that the defendants knew of the prison's serious problems with gang activity, that the risk of gang violence against targeted inmates was real and significant, and that Walsh was an inmate targeted for gang retaliation; despite that knowledge, the defendants devised and operated a classification system that ignored the risk.

In *Little v. Walker*, 552 F.2d 193 (7th Cir.1977), *cert. denied* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978), the district court had dismissed a complaint on the basis of what would now be considered qualified immunity. The plaintiff alleged that he had requested protective segregation status to avoid violent gang affiliated inmates and to avoid being disciplined for refusing to work in gang-dominated areas of the prison. Protective segregatees, however, were subject to the same denials of privileges as were disciplinary segregatees, and safekeepers were placed in a cell house "where the inmates most prone to violence are also housed." 552 F.2d at 195. Gang-affiliated inmates served meals to the safekeepers and, according to the complaint, withheld meals unless the safekeepers performed sexual acts through the cell bars. The complaint further alleged that the defendants "ignored plaintiff's entreaties to remedy the situation." *Id.* Gang-affiliated inmates later took over the cellhouse during a riot, after which the plaintiff continued to be assigned to that cell house.

In deciding the immunity issue, the *Little* court stated that during the time in which the prisoner was at the penitentiary "it was already well settled that the treatment he received while in Segregation–Safekeeping status was cruel and unusual punishment." 552 F.2d at 197. The court cited *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), for the proposition that, "Violent attacks and sexual assaults by inmates upon the plaintiff

while in protective segregation are manifestly 'inconsistent with contemporary standards of decency.' ... 'Deliberate indifference' to these happenings 'constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment.'" *Id.*

None of the foregoing cases clearly dictate resolution of Mr. McGill's claim. Somewhat less happened to Mr. McGill than happened to the plaintiff in *Little v. Walker;* the threat posed by inmates on disciplinary segregation to smaller, protective custody inmates such as Mr. McGill was somewhat less identifiable than the risk posed by gang-affiliated inmates in *Walsh v. Mellas* and *Watts v. Laurent* or by the inmates from whom the known rape victim begged for protection in *Richardson v. Penfold;* the risk of sexual assault upon Mr. McGill in any event was somewhat less than the risk of sexual assault on the transsexual in *Meriwether v. Faulkner.*

■ But none of those cases purport to state a constitutional baseline or factual minimum; none profess that a lesser showing cannot make out a case of deliberate indifference. The principles enunciated in those cases indicate that Mr. McGill presented sufficient evidence from which the jury reasonably could have found that defendants Duckworth, Bronnenberg, and Webb were deliberately indifferent to Mr. McGill's safety.

The jury reasonably could have found that Mr. McGill, a man of slight build, was harassed by other inmates, some of whom made sexual suggestions, commencing immediately upon his arrival at the State Prison. Willie Eugene McCann, who was an institutional investigator in 1984, testified that Mr. McGill had come to him several times about harassment (although it is unclear whether Mr. McGill related the sexual suggestions) and that he advised Mr. McGill to "try to stick it out", but also told him that protective custody was available.

Mr. McGill later told Mr. McCann of his observations of an inmate's attack on a correctional officer and heard himself referred to as, and threatened physically for being, a "snitch". Accordingly, he asked Mr. McCann for admission to protective custody. He was not aware until his arrival at IDU that he would be placed on a unit that housed inmates held in disciplinary segregation; he was not aware until the second day of his confinement on IDU that inmates were released from their cells for recreation and showers.

The jury also reasonably could have found that IDU had a somewhat higher incidence of violence and sexual attacks than the prison as a whole. Defendant Bronnenberg, who served as assistant superintendent of the prison in 1984, testified that he was aware of incidents of violence between inmates in protective custody and inmates on disciplinary segregation, but implemented no change in policy. Charles Wright, who in 1984 was a case manager assigned to disciplinary units (including IDU), testified that weaker inmates generally were more vulnerable to attack on IDU and admitted saying that he routinely told inmates on protective custody to protect themselves because he had seen many such inmates assaulted, especially "young white boys" trying to get away from the general population. He further testified that he and those who worked on IDU did not check out the reasons why an inmate sought protective custody because others make that decision.

Mr. Wright testified that he advised incoming protective custody inmates at IDU not to mix with inmates on disciplinary segregation. Mr. Bronnenberg testified that he instructed staff to handle protective custody inmates with care and allow them to remain by themselves while at IDU, but conceded that those instructions were not put in writing. The IDU population report for the time Mr. McGill was there did not identify Mr. McGill as a protective custody inmate, and defendant Brian Webb, a correctional officer on duty during the attack on Mr. McGill, testified that as far as he knew that day Mr. McGill was a disciplinary case. Mr. Webb also testified that he knew that Ausley was "one of the rowdy ones" who had been at IDU before. The IDU population report

indicated that Ausley was at IDU for disciplinary reasons.

These facts, which a reasonable jury could have found to be true from the evidence at trial, are sufficient to impute to defendants Duckworth, Bronnenberg, and Webb knowledge that protective custody inmates, particularly smaller "young white boys", were at physical risk from disciplinary segregation inmates while at IDU. Despite this knowledge, Mr. Duckworth (the prison's superintendent) and Mr. Bronnenberg (the assistant superintendent) continued unchanged the policy of commingling the two classes of inmates at IDU. They issued no policy directive concerning the separation of the two classes of inmates. As a result, Mr. McGill was placed on the IDU with disciplinary inmates and was released from his cell (a release that was afforded only fifteen minutes each day) with disciplinary inmates, including his ultimate assailant, Ausley.

Whether any of the defendants could have specified Ausley as Mr. McGill's ultimate assailant is unimportant.[9] The jury could have found that the harm that Mr. McGill suffered was foreseeable and that the defendants had or should have had knowledge of the risk of that harm: the risk of harm to protective custody inmates at the hands of disciplinary inmates was well known, and every sexual attack that had been reported at the prison that year had occurred at IDU. Mr. McGill suffered precisely that harm at the hands of one in the class that threatened him, and a reasonable jury could have found that by continuing the policy of commingling the two classes of inmates, Mr. Duckworth and Mr. Bronnenberg were deliberately indifferent to that risk.

Officer Webb had no say in the continuation of the policy; he was simply a correctional officer who worked in IDU. Nonetheless, the day after the assault, Officer Webb prepared a report that denied that the assault had occurred. Officer Webb wrote that Mr. McGill had gone nowhere near the shower and Ausley had not entered the shower. Having found that the attack occurred as Mr. McGill related it, the jury could have inferred that Officer Webb lied. The jury further reasonably could have found, as Mr. McGill testified, that when Mr. McGill tried to tell Officer Webb what had happened, Officer Webb cut him off with the statement, "Piss on you". The jury reasonably could have inferred that as he patrolled the IDU before and during the attack, Officer Webb was deliberately indifferent to the known risk of danger to Mr. McGill.

**2.**

In paragraphs 2(a), (c) and (d) of their motion, the defendants argue that Mr. McGill failed to demonstrate a causal connection between their acts and omissions and Mr. McGill's injury. For the reasons set forth above, the court believes that the evidence was sufficient for a reasonable jury to find such a causal connection.

**3.**

In paragraphs 3–6 of their motion, the defendants challenge the sufficiency of Mr. McGill's evidence on his pendent state negligence claim. They argue that:

—Mr. McGill presented no evidence that any defendant did not take reasonable steps to protect him from foreseeable danger or harm and so he failed to prove a breach of duty (¶ 3);

—Mr. McGill presented no evidence to indicate that the attack and injury were foreseeable to any defendant (¶ 4); and

—Mr. McGill failed to present evidence that any defendant could have acted in any other way that would have avoided the attack on Mr. McGill (¶ 5).

Recognizing that something more than mere negligence is necessary to support an Eighth Amendment claim, it would seem somewhat anomalous to find the evidence sufficient to support the federal claim but not the state negligence claim, and the court does not so find.

---

**9.** The defendants' motion for judgment n.o.v. states that Mr. McGill presented no evidence that Ausley was known, or should have been known, to be particularly aggressive in any way;

Officer Webb, however, testified that he knew Ausley to be a "rowdy one" not on his first visit to IDU.

Under Indiana law, negligence consists of three elements: (1) a duty on the part of an actor; (2) breach or failure to perform that duty; and (3) damages or injuries proximately resulting to another. *Cowe v. Forum Group, Inc.*, 541 N.E.2d 962, 966 (Ind.App.1989). Whether a duty exists is a question of law. *Snyder Elevators, Inc. v. Baker*, 529 N.E.2d 855, 857 (Ind.App.1988). Under Indiana law, "a public official, charged with the custody and care of a prisoner, owes a *private duty* to the prisoner to take reasonable precautions under the circumstances to preserve his life, health and safety ..." *Roberts v. State*, 159 Ind.App. 456, 307 N.E.2d 501, 505 (1974). The evidence outlined above is sufficient to allow a reasonable jury to find that the defendants breached that duty.

The evidence outlined above also is sufficient to meet Indiana's test of foreseeability:

The determination of what is reasonably foreseeable is not judged by the subjective opinions of those involved, but is based upon the standard of due care in avoiding a result which might reasonably have been anticipated in the ordinary experience of men. *Geyer v. City of Logansport* (1977), 267 Ind. 334, 370 N.E.2d 333, 337. If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of harm or the manner in which it occurred does not preclude liability. *Id.* Thus, liability does not depend on whether the defendant could have predicted injury would happen to the plaintiff in exactly the way it did or the statistical likelihood of the particular circumstances which befell the plaintiff. On the other hand, if the actor should have realized his conduct might cause harm to another in substantially the manner in which it is brought about, the harm is universally regarded as the legal consequence of the actor's negligence. *Tabor v. Continental Baking Co.* (1941), 110 Ind.App. 633, 38 N.E.2d 257, *trans. denied*, citing Restatement [Torts], § 435, comment b.

*Harper v. Guarantee Auto Stores*, 533 N.E.2d 1258, 1264 (Ind.App.1989).

The defendants' final preserved argument in support of its motion for judgment is that the evidence unequivocally demonstrated that Mr. McGill incurred the risk of his injury by voluntarily leaving his cell and walking to the shower with Ausley, knowing that Ausley had threatened him. Under Indiana law, incurred risk is an affirmative defense upon which the defendant bears the burden of proof. *Ridgway v. Yenny*, 223 Ind. 16, 57 N.E.2d 581 (1944). The defense "is based upon the proposition that one incurs all the ordinary and usual risks of an act upon which the actor voluntarily enters, so long as those risks are known and understood by the actor." *Clem v. United States*, 601 F.Supp. 835, 844 (N.D.Ind.1985). The defense requires a subjective analysis of the actor's actual knowledge and voluntary acceptance of the risk. *Kroger Co. v. Haun*, 177 Ind.App. 403, 379 N.E.2d 1004 (1978).

The Indiana Supreme Court recently stressed the importance of the voluntariness prong of the defense:

When incurred risk is at issue, the question often arises whether the plaintiff could or should have retreated once the danger and risk became apparent. We have held that even when a danger is known and appreciated, continued exposure to it does not amount to incurring its risk where there is no reasonable opportunity to escape from it or where the exposure is the result of influence, circumstances or surroundings which are a real inducement to continue despite the danger.

*Get–N–Go, Inc. v. Markins*, 544 N.E.2d 484, 487 (Ind.1989). In *Get–N–Go*, the court held that even though the plaintiff decided to continue on to the store after discovering the icy conditions outside the store, her acceptance of the risk was not altogether voluntary in light of her need for food for her next day's breakfast to avoid a possible adverse reaction to her insulin.

Mr. McGill presented evidence of inducement far greater than that which led Mrs. Markins to cross the Get–N–Go's icy

**1158**

parking lot. Mr. McGill testified that when he came out of his cell, Ausley began pushing him toward the shower, saying, "Come on, come on." Mr. McGill told Ausley he was going back to his cell, but Ausley said if Mr. McGill kept fighting, Ausley would throw him "over the range". Mr. McGill testified that he kept trying to turn around, but Ausley kept pushing him toward the shower.

This evidence, if credited by the jury, was sufficient to warrant a finding that the defendants had not met their burden of proving that Mr. McGill voluntarily incurred the risk of his injury.

### III.

Finally, the defendants argue that the judgment should be modified to prevent Mr. McGill from receiving a double recovery for his injury. The jury received separate verdict forms on the state claim (for which judgment would be joint and several) and the federal claim (for which judgments would be individual); the defendants agreed to that procedure. On the federal claim, the jury awarded damages in the sum of $8,000.00 against Mr. Webb and $1,000.00 each against Mr. Duckworth and Mr. Bronnenberg. On the state claim, the jury awarded damages in the sum of $10,-000.00 against all three defendants. The defendants describe the awards as "clearly duplicative" and ask that the judgment be modified in some unspecified manner as to limit Mr. McGill's recovery to a total of $10,000.00, citing *Clappier v. Flynn,* 605 F.2d 519 (10th Cir.1979).

Mr. McGill disagrees that entry of judgment on both theories of liability provides him a double recovery, but does not detail the scenarios that he claims would refute the defendants' contention. Further, he notes that the defendants sought no instruction to prevent double recovery, participated in devising the verdict forms, and neither sought clarification of the verdicts nor asked to poll the jury before it was discharged. Under these circumstances, Mr. McGill argues, the defendants are simply asserting a claim of error that they invited.

■ The parties' briefs provide the court with insufficient information on which to rule. The court cannot determine from the defendants' brief the manner in which they believe the judgment should be altered. Should judgment be entered in accordance with the § 1983 verdict, producing individual liability, and, if so, what is to be done with Mr. McGill's state rights concerning joint liability? Should judgment be entered in accordance with the state law negligence verdict, and, if so, what would remain of Mr. McGill's claim to be a "prevailing party" for purposes of 42 U.S.C. § 1988? Not surprisingly, since the defendants' brief leaves these issues untouched, Mr. McGill has offered nothing on those issues, either.

Further, the court cannot ascertain from Mr. McGill's brief what scenarios he may have in mind that would allow interpretation of the verdicts as something other than duplicative. Finally, the defendants have offered no response to Mr. McGill's arguments concerning waiver and invited error.

Accordingly, the court shall schedule a hearing on the defendants' motion to amend judgment to invite counsel's thoughts on these and other related issues.

### IV.

For the foregoing reasons, the court now DENIES IN PART the defendants' motion for judgment notwithstanding the verdict, for new trial, and to amend judgment, as follows:

A. Insofar as the motion seeks judgment notwithstanding the verdict, the motion is DENIED;

B. Insofar as the motion seeks a new trial, the motion is DENIED; and

C. Insofar as the motion seeks to amend the judgment to limit the plaintiff's recovery to $10,000.00, the court schedules a hearing on the motion to be held at 1:30 p.m. on December 19, 1989.

SO ORDERED.