**Junior Ray DUCKWORTH, et al.,**
**Plaintiffs-Appellees,**
**Cross-Appellants,**

**v.**

**Gayle FRANZEN, et al.,**
**Defendants-Appellants,**
**Cross-Appellees.**

**Nos. 85–1010, 85–1053, 85–1084 and 85–1095.**

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1985.

Decided Dec. 17, 1985.

Rehearings and Rehearings En Banc Denied Feb. 5, 1986.

Jeffrey W. Finke, Ill. Atty. Gen. Office, Chicago, Ill., for plaintiffs-appellees, cross-appellants.

J. Steven Beckett, Reno O'Byrne & Kepley, Champaign, Ill., for defendants-appellants, cross-appellees.

Before BAUER, POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

In November 1979 a bus used to transport prisoners between Illinois prisons caught fire from unknown causes. When the fire broke out, the 35 prisoners in the bus were in handcuffs, with all the prisoners on each side of the aisle being joined together by a chain running through the handcuffs. For reasons of security all exits but the front door of the bus had been sealed and there was a metal screen (like a mesh fence), probably locked (but the record is not clear on this), between the passenger area and the front door. When the bus filled with dense smoke each group of prisoners tried to rise and make its way to the front exit, but only one prisoner (who had managed to slip out of his handcuffs) succeeded in getting out, and a guard thrust him back into the bus. Eventually guards equipped with gas masks cut through the chains and brought the prisoners out. One prisoner died from the ordeal. Others suffered serious, and in at least one case permanent, lung injury. Twenty-one of the injured prisoners brought suit against three prison officials and three guards under section 1 of the Civil Rights Act of 1871 (now 42 U.S.C. § 1983), charging that by failing to take effective precautions against the consequences of a fire on the bus the defendants had visited cruel and unusual punishment on the plaintiffs in violation of the Eighth Amendment, which has been held applicable to the states under the due process clause of the Fourteenth Amendment. The complaint included a pendent claim against these six defendants for negligence and a diversity claim based on products liability against a seventh defendant, the manufacturer of the bus.

 The district judge severed the claim against the bus company, and it remains in the district court, awaiting trial. He dismissed the pendent claim. The civil rights claim was tried to a jury, which awarded damages totaling $561,000 (including punitive damages) against three of the defendants—Franzen, the head of the Illinois prison system at the time of the fire; Wolff, the then warden of Joliet prison, the distribution point for prisoners entering the Illinois prison system and the place where the bus was kept; and Hert, the then director of security at Joliet—but exonerated the three guards who had been in charge of the

bus when the fire occurred. Although the judgment is not final in the sense of winding up the entire litigation—for the plaintiffs' claim against the bus company has yet to be tried—the judge quite properly has certified the judgment for an immediate appeal under Rule 54(b) of the Federal Rules of Civil Procedure. It disposes, with finality in the district court, of the claims against the other defendants, and they should not have to wait until the case against the bus company is concluded to get a definitive determination of their liability.

The three defendants who were found liable argue mainly that the plaintiffs' suit is barred by the Eleventh Amendment and that in any event no reasonable jury could have found them guilty of inflicting cruel and unusual punishment. The plaintiffs, cross-appealing from the dismissal of the pendent claim, argue that the district judge was wrong to think it barred by the Eleventh Amendment, especially when the judge thought the Eleventh Amendment no bar to the civil rights claim. Several of the plaintiffs also challenge the jury's award of damages to them, as too low.

█ The defendants say they were sued in their official capacities, making this a suit against the state. If you believe that a state officer has violated your constitutional rights, you have a choice between suing the officer personally and suing the state. If you go the former route you don't have to worry about the Eleventh Amendment but do have to worry about various personal defenses, such as good-faith immunity; if you go the latter route you don't have to worry about personal defenses but may have to worry about the Eleventh Amendment. See *Kentucky v. Graham*, —— U.S. ——, 105 S.Ct. 3099, 3105–06, 87 L.Ed.2d 114 (1985). A suit against an official in his official rather than individual capacity is a suit against the state. See *id.*, 105 S.Ct. at 3105; *Brandon v. Holt*, —— U.S. ——, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985).

█ The complaint named Franzen "in his capacity as Director of the Illinois De-

partment of Corrections," but Wolff and Hert merely as "Former Warden of the Joliet Correctional Center" and "Former Chief of Security" at Joliet, respectively, and the three guards just as "Officers of the Illinois Department of Corrections." The same designations appear in the part of the complaint that asks for damages. All this might seem to clinch the case for regarding the suit against Franzen, at least, as an official-capacity suit and hence barred by the Eleventh Amendment; for section 1983 did not abrogate the states' Eleventh Amendment immunity from damage suits, *Owen v. Lash*, 682 F.2d 648, 654 (7th Cir.1982), and Illinois has not waived that immunity. Although the Eleventh Amendment, read literally, forbids the federal courts to exercise jurisdiction over any suit by a citizen against a state, they may do so if the state consents, *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S.Ct. 3057, 3058, 57 L.Ed.2d 1114 (1978) (per curiam) —a rare example of the conferral of subject-matter jurisdiction by consent.

█ Not only suing a defendant in his official capacity, but even just naming the defendant's office, raises a presumption that he is being sued only in his official capacity. See, e.g., *Kolar v. County of Sangamon*, 756 F.2d 564, 568–69 (7th Cir. 1985); *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869–70 and n. 12 (7th Cir.1983). It suggests that the plaintiff is really after the employer, which is to say the state or a state agency. But the presumption cannot be conclusive in a system such as the Federal Rules of Civil Procedure create, in which the complaint does not fix the plaintiff's rights but may be amended at any time to conform to the evidence. See Fed. R.Civ.P. 15(b); *Regents of the University of Michigan v. Ewing*, —— U.S. ——, 106 S.Ct. 507, 511 n. 6, 88 L.Ed.2d 523 (1985); *Phillips v. Vandygriff*, 711 F.2d 1217, 1225 n. 9 (5th Cir.1983). Whatever the plaintiffs may have had in mind when they named Franzen "in his capacity as Director" of the Illinois prison system, the case was tried as a suit against the defendants as individuals. This is shown most dramatically by

·the fact that the judge, at the defendants' request, instructed the jury that all of the defendants were being sued as individuals, that they were liable only for their personal acts or omissions to act, and that neither the State of Illinois nor the Illinois Department of Corrections was a defendant.

The defendants do not argue that the form of the complaint misled them. Bear in mind that Franzen resigned as Director of the Illinois Department of Corrections while the suit was in progress, while Wolff and Hert had already resigned from the offices named in the complaint. If the state attorney general's office, which represents state officials whether sued in their official or individual capacities, had thought this a suit against Franzen or Wolff or Hert in their official capacities, we do not understand why it did not move in either the district court or this court to substitute their successors in office as defendants in their place. See Fed.R.Civ.P. 25(d)(1); Fed.R.App.P. 43(c). We hold that substance trumps form and that all the defendants were sued in their individual capacities. That this issue may not recur we urge counsel for civil rights plaintiffs when they are suing a state officer in his individual capacity to say so plainly; and if in both his individual and official capacities to make that unmistakably clear, too. *Kolar v. County of Sangamon, supra,* 756 F.2d at 568–69.

But being sued in their individual capacities the defendants could be held liable only for their individual wrongdoing. Section 1983 does not recognize a doctrine of superiors' liability. *McKinnon v. City of Berwyn,* 750 F.2d 1383, 1390 (7th Cir. 1984). Such a doctrine would be analogous to respondeat superior, which makes the employer, as distinct from a superior employee, liable for an employee's tort—and which is also unavailable in suits under section 1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 691–94, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978). So Franzen could not be held liable for the torts of his subordinates in the Department of Corrections. As there is no

evidence of Franzen's individual wrongdoing—no evidence for example that he rewrote the guards' manual to eliminate some safety precaution in the event of fire—it may seem that the suit must really be against the office, and hence the state, not against the man. But the plaintiff is the master of his complaint. If he proceeds on a theory that he cannot substantiate factually, he is barred because of his failure of proof, not because another theory which he did not pursue is barred by an immunity. The plaintiffs charged Franzen with personal wrongdoing. Having utterly failed to prove that, they cannot get a judgment against him, but this conclusion has nothing to do with the Eleventh Amendment and does not resolve the liability of the other defendants. ·

An Illinois statute entitles state employees to be indemnified by the state for damages imposed on them for acts committed in the course of their state employment, unless the employee acted willfully or wantonly. Ill.Rev.Stat. ch. 127, ¶ 1302(d). ·The defendants argue that the statute makes this a suit against the state, because the state will end up footing the bill for any damage judgment against them. Yet every court that has considered this issue has rejected, rightly in our view, the argument that an indemnity statute brings the Eleventh Amendment into play. See, e.g., *Wilson v. Beebe,* 770 F.2d 578, 588 (6th Cir.1985); *Demery v. Kupperman,* 735 F.2d 1139, 1146–49 (9th Cir.1984); *Downing v. Williams,* 624 F.2d 612, 626 (5th Cir.1980), vacated on other grounds, 645 F.2d 1226 (1981) (per curiam).

Forget about the fact that the statute does not require the state to indemnify for punitive damages (because awarded only for conduct that is willful or wanton, or much worse); for as a matter of fact the State of Illinois usually indemnifies its employees for such damages and we assume would do so here. Nevertheless the purpose of the Eleventh Amendment is only to protect the state against involuntary liability. If the state chooses to pick up the tab for its errant officers, its liability for their

torts is voluntary. It is true that the burden of tort judgments against state employees may eventually come to rest on the state with or without indemnity. If the state doesn't indemnify its officers it may have to pay them higher salaries so that they can buy insurance that will do so. But this type of argument has never succeeded in getting the bar of the Eleventh Amendment extended to suits against state officers in their individual capacities, and anyway is unrelated to the indemnity statute. Moreover, it would be absurd if all a state had to do to put its employees beyond the reach of section 1983 and thereby make the statute ineffectual except against employees of local governments (local government is not protected by the Eleventh Amendment) was to promise to indemnify state employees for any damages awarded in such a suit.

■ The defendants' last argument under the Eleventh Amendment is that since state law requires the state to pay, and it has paid, the plaintiffs' medical expenses, this suit insofar as it seeks the recovery of such expenses as an item of damages is really against the state. The opposite would be more nearly correct, once it is established that this is a suit against the defendants in their individual rather than official capacities. Insofar as the state has paid medical expenses incurred as a result of the defendants' wrongful acts, the state would have (but for the indemnity statute) a claim against the defendants to reimburse it. Its position would be akin to that of a coplaintiff, subrogated to so much of the plaintiffs' claim as seeks reimbursement for medical expenses that the state rather than the plaintiffs has actually borne.

The defendants' alternative argument against liability is that, even viewing the evidence in the light most favorable to the plaintiffs, as of course we must do in appraising the argument, what they did could not reasonably be thought a violation of the Eighth Amendment. Negligence, perhaps; gross negligence—giving due regard for the jury's verdict—perhaps; but not cruel and unusual punishment. This is clear enough with regard to Franzen. Not having been personally involved in the security and safety measures regarding the bus, he is guilty at worst of neglect. But the other two appellants were personally and responsibly involved in securing the bus and in taking or failing to take measures to assure the safety of the prisoners transported on the bus. Their role is analogous to that of the police chief in *McKinnon v. City of Berwyn, supra,* 750 F.2d at 1391, who, having participated in conduct of his subordinates that led to the plaintiff's false arrest and brutal treatment, could be jointly liable with them for violating the plaintiff's civil rights. Still we must decide whether what Wolff and Hert did or failed to do amounted to the infliction of a cruel and unusual punishment.

The constitutional prohibition of "cruel and unusual punishments" apparently was intended, as the words suggest, merely to prohibit barbarous punishments—punishments having the character of torture, see Granucci, *"Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning,* 57 Calif.L.Rev. 839, 840–42 (1969)—although the Supreme Court has interpreted the historical record somewhat more broadly, see, e.g., *Ingraham v. Wright,* 430 U.S. 651, 664–67, 97 S.Ct. 1401, 1408–10, 51 L.Ed.2d 711 (1977). And originally, of course, the prohibition was only against the federal government's inflicting such punishments, the Bill of Rights not being applicable to the states. But the Supreme Court has decided that freedom from cruel and unusual punishments is one of the liberties secured against state action by the due process clause of the Fourteenth Amendment, and like freedom of speech one of those liberties a state cannot deprive a person of even if does so by impeccable procedures. See, e.g., *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

Even so, the plaintiffs could get nowhere if the words "unusual" and "punishment" were given anything like their normal

meanings. The infliction of punishment is a deliberate act intended to chastise or deter. This is what the word means today; it is what it meant in the eighteenth century; Samuel Johnson's *Dictionary of the English Language* (1755) defines "punishment" as "Any infliction or pain imposed in vengeance of a crime." If a guard decided to supplement a prisoner's official punishment by beating him, this would be punishment, and "cruel and unusual" because the Supreme Court has interpreted the term to forbid unauthorized and disproportionate, as well as barbarous, punishments. See *Ingraham v. Wright, supra,* 430 U.S. at 664–67, 97 S.Ct. at 1408–10, summarizing the case law. But if the guard accidentally stepped on the prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word, whether we consult the usage of 1791, or 1868, or 1985. Again, if a prisoner has a serious illness and the prison staff, though fully aware of the gravity of the illness, refuses to treat it and the prisoner dies, this could well be deemed, and under current case law would be deemed, the infliction of punishment. See, e.g., *Joseph v. Brierton,* 739 F.2d 1244, 1246 (7th Cir. 1984). But if the staff merely misdiagnoses the illness and thinking it trivial does not treat it, and the prisoner dies, this would not be punishment in any accepted meaning of the word even if the diagnosis was negligent. See, e.g., *Benson v. Cady,* 761 F.2d 335, 341 (7th Cir.1985) (dictum).

These are the easy cases; the hard ones are where the behavior of the prison's staff is somewhere in between careless and deliberate infliction of suffering; and we must consider where the line is drawn. The reigning formula of course is "deliberate indifference," e.g., *Jones v. Morris,* 777 F.2d 1277, 1280 (7th Cir.1985), but the term is not self-defining. Indeed, like other famous oxymorons in law—"all deliberate speed" for example or "substantive due process"—it evades rather than expresses precise meaning.

The usual intermediate category in law between negligence and deliberateness is recklessness; and reflection on the commo-

nest legal meanings of "reckless" may point us to a solution of our conundrum. One usage, common in tort law, essentially equates recklessness to gross negligence. See Prosser and Keeton on the Law of Torts 214 (5th ed. 1984). If negligence under Judge Learned Hand's formula in *United States v. Carroll Towing Co.,* 159 F.2d 169, 173 (2d Cir.1947), and in later cases such as *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba,* 683 F.2d 1022, 1026 (7th Cir.1982), means that the cost of averting an accident is less, even if just a hair's breadth less, than the expected cost of the accident that would be averted, recklessness in the sense of gross negligence means that the disparity between the cost of prevention and the expected accident cost is great. A quite different sense of recklessness, familiar from criminal law, is the sense in which for example a wrongful, deliberate, and very dangerous act which results in death though death was not intended may be downgraded to second-degree murder, with first-degree murder being reserved for deliberate homicide. A classic example is where the defendant chokes his victim, intending to injure him seriously but not to kill him, but death results. See *Commonwealth v. Marshall,* 287 Pa. 512, 135 A. 301 (1926); LaFave & Scott, Handbook on Criminal Law 568 (1972). The defendant has deliberately committed an act that is at once socially costless to avoid (by not choking his victim in the first place) and highly dangerous. So he is severely punished, for an act that was deliberate and wrongful as well as for a consequence that was lethal though unintended. As this example suggests, recklessness in criminal law implies an act so dangerous that the defendant's knowledge of the risk can be inferred. See Perkins & Boyce, Criminal Law 849–51 (3d ed. 1982).

■ If the word "punishment" in cases of prisoner mistreatment is to retain a link with normal usage, the infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal

law sense. Gross negligence is not enough. Unlike criminal recklessness it does not import danger so great that knowledge of the danger can be inferred; and we remind that the "indifference" to the prisoner's welfare must be "deliberate," e.g., *Estelle v. Gamble, supra,* 429 U.S. at 104, 97 S.Ct. at 291; *Jones v. Morris, supra,* at 1280, implying such knowledge. Although some cases contain language more suggestive of the tort definition of recklessness than of the criminal law definition, see, e.g., *Benson v. Cady, supra,* 761 F.2d at 339–40; *Estate of Davis v. Johnson,* 745 F.2d 1066, 1071 (7th Cir. 1984); *State Bank v. Camic,* 712 F.2d 1140, 1146 (7th Cir.1983), they are cases where the prisoner had failed to prove recklessness even in the tort sense, and it was not important therefore whether he would have had to prove even more in order to win the case.

 The cases where a prisoner complaining of mistreatment has been allowed to recover damages under the Eighth Amendment in fact involve recklessness in the strong sense. For example, if a prisoner tells the prison doctor that he is allergic to penicillin, but the doctor injects him with penicillin anyway and the prisoner has a severe reaction, the doctor is guilty of having inflicted a cruel and unusual punishment; that was our case of *Thomas v. Pate,* 493 F.2d 151, 158 (7th Cir.), vacated and remanded on other grounds under the name of *Cannon v. Thomas,* 419 U.S. 813, 95 S.Ct. 288, 42 L.Ed.2d 39 (1974) (per curiam). But if before injecting him the doctor merely fails to tell the prisoner what is in the syringe, and thus gives the prisoner no chance to alert him to a possible (and quite common) allergy, the doctor is not guilty of violating the Eighth Amendment even if it is a palpable act of medical malpractice to inject someone with penicillin without first asking him whether he is allergic. Cf. *Estelle v. Gamble, supra,* 429 U.S. at 107, 97 S.Ct. at 292. In the first case the doctor knows there is a great danger, could avert it at trivial cost (though greater than in the case of reckless murder that we gave earlier), but instead ignores it. In the second case the doctor should know there is some danger, but he is inadvertent. Although it is conceivable if improbable that his inadvertence would be deemed unreasonable enough—given the trivial burden of inquiry—to make his conduct reckless in a tort sense, punishment cannot be inadvertent. Punishment implies at a minimum actual knowledge of impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it. Such facts "as a history of accidents or a previous request for repairs that had fallen on deaf ears" are therefore important. *Jones v. Morris, supra,* at 1280 n. 5.

 In the present case, even if the defendants' conduct was negligent or even grossly negligent, a reasonable and properly instructed jury could not have found it sufficiently reckless to be called punishment. To begin with, the danger of a serious accident, though plain enough in retrospect, was not believed to be great and was not objectively so great that Wolff's and Hert's actual knowledge of the danger can be inferred. There had never been a fire on a prison bus in Illinois. This bus had been in service without incident for more than a year before the fire. The plaintiffs' able counsel presented no evidence of even a single instance in the history of this country (or for that matter any other country) of a fire on a prison bus or other vehicle in which someone was being transported under restraint. Obviously there have been such fires but they must be exceedingly rare.

Maybe no other bus has ever been so hard to get out of in an emergency as this one, but that is unlikely too. The security modifications that resulted in the sealing of the windows, roof hatch, and exits were copied from the buses that the Immigration and Naturalization Service uses to transport illegal aliens under arrest. Apparently none of those buses has ever been involved in an accident in which a prisoner was hurt because he had difficulty getting

out of the bus. *McKinnon,* cited earlier, is illustrative of a number of cases where a prisoner was hurt.by being banged against the inside walls of a speeding paddy wagon, see 750 F.2d at 1386, but that is an entirely different problem. The plaintiffs point out that the bus involved in the present case made long trips, while INS buses (maybe) operate mostly within cities, but we cannot see what difference that would make. It is the length of time a bus is in use rather than the length of the particular journey that counts in deciding whether the experience of the bus is comparable to that of some other bus, and there is no evidence that the INS uses its ·buses less than the Illinois prison authorities use theirs.

Although a ·manual prepared after the security modifications were made alludes to the possibility of fire, states truistically that "a fire which cannot be extinguished immediately should result in the orderly removal of residents [prisoners] from the bus," and adds somewhat ominously, "Under no circumstances should the restraining devices be removed unless a resident's life is in immediate danger," the defendants' foresight should not be the lever that raises their conduct from negligent to reckless. They realized that there could be a fire on the bus but given the absence of any known history of fires they naturally did not rate the danger high and therefore did not give much thought to the problems that might arise if there were a fire; other problems of prison administration must have seemed much more pressing. In particular they failed to realize that a large group of prisoners who were chained together might have difficulty getting out of the bus. While the chain itself was not fastened to the bus, if one prisoner tripped on his way out—a likely occurrence in conditions of panic, fear, and in this case darkness caused by smoke (but the density of the smoke was hardly foreseeable)—the rest of the group would be stuck; and there were two groups. All this is clear in hindsight. But it was not foreseen. People often fail to foresee disasters of a kind that have not yet occurred and to take effective precautions against them, and ordinarily such lack of foresight is at worst negligence; it certainly is not recklessness in anything like the criminal law sense of the word.

*Davis v. United States,* 716 F.2d 418 (7th Cir.1983), a case under the Federal Tort Claims Act, provides an instructive contrast. The plaintiff broke his neck when he dove into a lake in a federal wildlife refuge. The bottom of the lake had dangerous rock outcroppings near the shore. The government had failed to take effective steps to warn the public of the danger even though there had been five similar diving accidents in another and similar lake in the same wildlife refuge in the recent past. We held that the government's failure to warn had been willful and wanton (=grossly negligent) but not willful and malicious. Yet it was a stronger case for the plaintiff than the present case. Here no history of accidents conveyed an unmistakable warning that the expected accident cost if no further precautions were taken was very high. And while the plaintiffs argue that the statement in the manual about "immediate" danger to life being the only warrant for removing handcuffs puts too much emphasis on security relative to safety and thereby evinces a conscious indifference toward prisoners' lives, they are putting too much emphasis on one word; the passage as a whole suggests a concern for, rather than callousness toward, prisoners' safety.

Not only was the perceived danger not great but the means of averting it were not simple, obvious, or cheap. Six years after the accident it is still not clear what the defendants should have done if they had thought more carefully about the danger that materialized. They could have forgone the security modifications. But the modifications were in response to a long history of escapes from Illinois prison buses. Thirty-five felons are a dangerous concentration. They cannot be transported with safety to themselves, the community, the driver, or the guards unless they are manacled and the exits sealed. The modifications were reasonable. The question was

what to do, given them, to minimize the danger that the prisoners might be trapped in an accident or a fire.

This is a difficult question, reminding us that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). The plaintiffs tell us that after the accident the prison authorities put little plaques on the backs of the seats in the bus, telling the prisoners not to panic in the event of an accident or fire; this seems to us a meager palliative, unlikely to have had the slightest effect on what occurred on the day of the fire. The plaintiffs suggest that maybe a device could have been rigged by which the driver or a guard could push a button and release the chain and perhaps the sealed exits and windows. But the record contains no evidence concerning the feasibility, expense, or dangers of such a system (the danger, for example, that a prisoner would reach the button).

Maybe the prisoners shouldn't have been chained to one another. Maybe fewer prisoners should have been transported at one time. The plaintiffs do not press these points on us. Their principal suggestion is—fire drills. This we find impossible to visualize. The bus starts in Joliet and meanders about the state, dropping off prisoners at the various prisons to which they have been assigned after being processed at the intake center at Joliet and picking up prisoners who are being transferred to other prisons. The logic of the plaintiffs' argument is that every time the bus picked up a new passenger there would have to be a new fire drill. Guards would have to surround the bus to make sure the prisoners didn't use the occasion of the fire drill to run away. Maybe, despite these objections, prison bus fire drills are a good idea but they are not so simple and obvious a

one that the failure to have conducted them—before there had been an accident—convicts the defendants of a deliberate indifference to the safety of their charges. The record contains no evidence about precautions used by other prison systems. It is of course possible that the fault here lay not with the officials responsible for the security and safety arrangements of the bus but with the guards who reacted slowly to the fire and failed to release the chains that bound the prisoners in clumsy groups—not to mention the guard who forced one prisoner back into the bus. But the jury exonerated the guards and the plaintiffs have not appealed from that part of the judgment.

We know the cases in which prison officials have been ordered to take steps to remove fire hazards, and we acknowledge that in some of them little attention was paid to the question whether the hazards were so great as to amount to cruel and unusual punishment. See, e.g., *Hoptowit v. Spellman,* 753 F.2d 779, 783–84 (9th Cir.1985); *Santana v. Collazo,* 714 F.2d 1172, 1183 (1st Cir.1983); *Leeds v. Watson,* 630 F.2d 674, 675–76 (9th Cir.1980); *Battle v. Anderson,* 564 F.2d 388, 395 (10th Cir. 1977). In others, however, this essential requirement for liability was properly stressed. See, e.g., *Shrader v. White,* 761 F.2d 975, 984–86 (4th Cir.1985); *Ruiz v. Estelle,* 679 F.2d 1115, 1152–53 (5th Cir. 1982), modified, 688 F.2d 266, 267 (1982) (per curiam). The latter decisions (amongst which we include our recent decision in *French v. Owens,* 777 F.2d 1250, 1257 (7th Cir.1985), where we said, "The eighth amendment does not constitutionalize the Indiana Fire Code") we consider better reasoned. But in any event the cases that involve equitable remedies against fire hazards in prisons are distinguishable from this case. Prison fires, as distinct from prison *bus* fires, are common and both their hazards and the necessary precautions well known. A judgment of reckless disregard for prisoners' safety is therefore easier to make. And there is a difference between a suit to remove a fire

hazard and a suit for damages after a fire has occurred. In the former case the filing of the suit puts the prison officials on notice of a potential hazard; and if the hazard is demonstrated, yet they refuse to do anything, maybe that is evidence of a reckless disregard for safety.

The district judge should have granted judgment for the defendants notwithstanding the jury's verdict; obviously the cross-appeal by the individual plaintiffs who complain that the damages the jury awarded were inadequate must be dismissed. The defendants' complaints about the jury instructions and evidentiary rulings are moot.

■■■■ That leaves only the question whether the judge was right to dismiss the pendent claim. He thought it barred by the Eleventh Amendment. But if, as he and we believe, the civil rights claim was brought against the defendants in their individual capacities, we can think of no reason for believing that the pendent negligence claim was brought against them in their official capacities; nor do the defendants suggest any reason. The judge hinted that he might have dismissed the pendent claim anyway because the jury might be confused if it had to consider the defendants' liability under both the Eighth Amendment and the common law of negligence. But we do not understand this either. The plaintiff in a personal injury case will often allege different levels of culpability, ranging upward from negligence, in the hope of getting punitive as well as compensatory damages or of defeating defenses such as comparative or contributory negligence that are effective only against the lesser forms of culpability. This has never been thought a source of serious confusion. The almost complete factual overlap between the main and pendent claims in the present case makes this a natural case for the retention rather than relinquishment of pendent jurisdiction; and while the district judge has a broad discretion in making what amounts to a managerial judgment on whether to allow a plaintiff to bring one case in federal court or

force him to litigate his state claim in state court, we cannot uphold an exercise of discretion so flawed as the one before us.

■■■■ But what to do about this is another question. Since we are ordering the federal claim dismissed, since pendent party jurisdiction cannot be used to reattach the pendent negligence claim to the plaintiffs' diversity claim against the bus company, *Hixon v. Sherwin-Williams Co.*, 671 F.2d 1005, 1007–09 (7th Cir.1982), and since pendent claim jurisdiction should normally be relinquished when the federal claim is dismissed before trial, see *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), it would seem that a remand to the district court to reconsider his ruling on pendent jurisdiction could have but one result: the dismissal of the pendent claim.

But two considerations argue against this result. The first, and lesser, is that where there has been a trial, considerations of judicial economy may support retention of the pendent claim for any further trial proceedings, as we said in *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 458–59 (7th Cir.1982). But that was a case where the pendent as well as main claims had been tried once, and the question was whether the retrial was to be in federal or state court; even then we noted reasons for relinquishing pendent jurisdiction—which the district judge in fact did on remand. See *In re Cenco Inc. Securities Litigation*, 601 F.Supp. 336, 342–44 (N.D. Ill.1984).

Second, and more important, the statute of limitations has run on the pendent claim. This is a conventional reason against relinquishing pendent jurisdiction after dismissal of the main claim. See, e.g., *O'Brien v. Continental Illinois Nat'l Bank & Trust Co.*, 593 F.2d 54, 65 (7th Cir.1979); *Joiner v. Diamond M Drilling Co.*, 677 F.2d 1035, 1043 (5th Cir.1982). Ordinarily, however, it is not a reason in the federal courts of Illinois. An Illinois statute provides that a case dismissed by a federal court on jurisdictional grounds—and a relinquishment of pendent jurisdiction is jurisdictional—can

be refiled within a year in state court, and in the interim the statute of limitations will stop running. Ill.Rev.Stat. ch. 110, ¶ 13–217; see *Bernstein v. Lind-Waldock & Co.,* 738 F.2d 179, 188 (7th Cir.1984). But this particular provision became effective in 1980, after this suit was brought. We know the provision would not be applied retroactively to revive a time-barred cause of action, see *Conner v. Copley Press, Inc.,* 99 Ill.2d 382, 388, 76 Ill.Dec. 820, 822, 459 N.E.2d 955, 957 (1984), but the plaintiffs' suit was not time-barred when the provision was enacted. Even if the new provision is applicable, however, another obstacle looms: the one-year period in an earlier but materially identical statute was held to begin running when the case was dismissed rather than when the dismissal was affirmed. See *Hupp v. Gray,* 73 Ill.2d 78, 22 Ill.Dec. 513, 382 N.E.2d 1211 (1978). If this ruling applies to the current statute, as well it may, the period for filing suit in state court has long since run out.

 Given these uncertainties, on remand the district judge should not dismiss the pendent claim unless the defendants agree to waive their statute of limitations defense in state court. See *Financial General Bankshares, Inc. v. Metzger,* 680 F.2d 768, 778 (D.C.Cir.1982). This point is applicable, by the way, to all the defendants, not just the three who are the appellants. With regard to retention of a pendent claim in order to prevent the bar of the statute of limitations from falling, it does not matter when the main claim is dismissed; it certainly does not matter whether it is after trial (as in the case of the three guards) or after appeal (as in the case of the three officials who are the appellants).

We reverse the district judge's judgment for plaintiffs with directions to dismiss the federal claims with prejudice, but we also reverse the judgment insofar as it dismissed the pendent claim. The plaintiffs have lost their constitutional tort suit against the six defendants involved in this appeal but their common law tort suit against them remains alive. The case is remanded for further proceedings consistent with this opinion; no costs in this court.

REVERSED AND REMANDED.