**Billy B. TUCKER, Plaintiff,**

v.

**Richard A. RANDALL and Albert Speenburgh, in their individual capacities and in their official capacities as officers of the Sheriff's Department of Kendall County, Illinois, Defendants.**

**No. 88 C 7366.**

United States District Court, N.D. Illinois, E.D.

Dec. 8, 1993.

Douglas A. Graham and C. John Koch, Jenner & Block, Chicago, IL, for plaintiff.

James R. Schirott, Patrick K. Bond, Mary E. Dickson, Schirott & Luetkehans, and Charles E. Hervas and James Gus Sotos, Hervas Sotos & Condon, Itasca, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiff Billy B. Tucker ("Tucker"), a former detainee at Kendall County jail, brought a four-count complaint pursuant to Section 1983 and Illinois common law against Defendants Richard A. Randall ("Randall") and Albert Speenburgh ("Speenburgh"), officers of the Sheriff's Department of Kendall County, alleging inadequate medical care (Count I), inadequate access to a telephone and illegal taping of phone conversations (Count II), and inadequate prison conditions (Counts III and IV). Defendants filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56(c) on the basis of qualified immunity. For the reasons set forth below, we grant summary judgment on all counts.

## FACTUAL BACKGROUND

Plaintiff Tucker is a former detainee of the Kendall County Jail in Yorkville, Illinois. He is presently imprisoned in the Illinois River Correctional Center in Canton, Illinois. Defendant Sheriff Richard Randall was sworn into the office of Sheriff of Kendall County on December 1, 1986. Prior to this date, on September 29, 1986, Randall's name had appeared as "sheriff" on inspection reports, and after November 4, 1986, Randall had been the "Sheriff-elect." Defendant Albert Speenburgh was employed as a Lieutenant with the Kendall County Sheriff's Department at all times relevant to this lawsuit. Randall delegated direct day-to-day supervision of the Kendall County jail to Speenburgh.

### Medical Treatment

On November 9, 1986, Tucker was involved in a bar fight that took place at T's Tap in Plano, Illinois. Tucker was arrested and taken by ambulance to a hospital. On the way to the hospital and again at the hospital, Tucker complained of injuries to his hand and to his ribs. The doctor at the hospital noted that Tucker complained of pain in the right anterior chest, lower back and face. Upon his examination, the doctor found slight tenderness in the right anterior chest wall and a lack of crepitation, which is the sound of cracked ribs.

As a result of his examination, the doctor diagnosed Tucker as suffering from multiple blunt trauma. Medical instructions for Tucker's treatment included: (1) keep wounds clean and apply ice to face, (2) watch for signs of infection, (3) follow-up with a doctor in 3 to 5 days, and (4) aspirin every four hours for two days.

Tucker was released from the hospital and was booked into the Kendall County jail on a charge of murder at 3:15 a.m. on November 10, 1986. The policy of the jail was that an inmate who was arrested in the hospital

could not be incarcerated without proof of a doctor's certificate stating that he was medically, physically, and mentally capable of being imprisoned. Norman Tracey ("Tracey") was the booking officer the night Tucker was brought to the jail. Tracey recalls that Tucker looked beat up when he was booked. Tucker's face had several cuts and abrasions. Defendants admit that the hospital medical record, including the "instructions to patient" section, was contained in the records of the Kendall County Sheriff's Department.

Tracey, through a question and answer session with Tucker, filled out a medical form at the time of the booking. The medical form does not show any report of injuries to hand or ribs made by Tucker. Tucker disputes that such a session between Tucker and Tracey occurred in the manner described above and disputes that the form was accurate. Tucker did not tell Tracey about his need to follow up with a doctor in 3 to 5 days.

On November 10, 1986, Tucker was placed in a cell with Darrell Knapp ("Knapp"), another pretrial detainee, and four other prisoners. Knapp testified that Tucker could barely move at this time, that his right hand was swelled up, and that he complained that his ribs hurt.

Tucker complained to a prison guard, Officer Jon Smiley ("Smiley"), about the pain in his hands and ribs, and Smiley testified that he relayed these complaints to Speenburgh. Speenburgh denies knowledge of any such complaints from Tucker or a jail officer. According to Smiley's testimony, when he conveyed Tucker's complaints to Speenburgh, Speenburgh always granted him medical contact.

State regulations require that pretrial detainees receive a medical screening after they have been in jail for fourteen days and that was also the policy of the Kendall County jail. Upon gaining the office of Sheriff, Randall admits that he did not ensure that 14–day medical screenings were taking place. Speenburgh also admits that he was not always able to follow the 14–day screening requirement, but claims that he attempted to meet it to the best of his ability. Speenburgh admits that Tucker's medical examination on January 21, 1987 was his 14–day screening requirement even though it should have occurred two months earlier.

Tucker's physical examination on January 21, 1987 was performed by general practitioner Dr. Jose Bernal ("Dr. Bernal"). Dr. Bernal had treated Tucker for various ailments in the past, dating at least as far back as 1977. The physical exam included visual examination of Tucker, including his extremities. Dr. Bernal did not note in the medical records any complaints by Tucker about his hand or ribs, nor did he note that Tucker should be referred to a specialist.

Tucker saw Dr. Bernal at later dates in 1987 for a skin rash, an earache, vomiting, dizzy spells and having a tendency to faint. Tucker did not mention his hand or rib injury to Dr. Bernal during any medical examination conducted after January 21, 1987. Tucker explains that he did not complain because Dr. Bernal had already told him that he was not qualified to treat such injuries. Tucker states that he personally discussed his hand injury with Speenburgh on multiple occasions but Speenburgh recalls talking about it on only one occasion.

Kendall County jail had a sick call procedure in place in 1986 and 1987 which called for the jail officer on duty in the morning to conduct an oral examination of each inmate to determine if the inmate required medical care. The inmates, and the response given, were noted in written reports given prior to 8:30 or 9:00 a.m. on a daily basis to Speenburgh. If an inmate required medical care, Speenburgh would talk with them, and arrange for needed physician's appointments.

Kendall County jail had a medications log procedure in place in 1986 and 1987 which called for jail officers to note when medication was given to an inmate. The log maintained for Tucker reveals that over the period of his incarceration at Kendall County jail, he received Tylenol on numerous occasions, otic solution for his earache, Micro K and Tagamet.

In addition to the sicknesses noted above for which Tucker saw Dr. Bernal, Tucker was admitted, on Dr. Bernal's recommendation, to the Sandwich Hospital in Plano, Illinois on August 7, 1987. He was placed there

for treatment on complaints of weight loss, dizziness, weakness and vomiting. Tucker tolerated a full regular diet during his two-day hospital stay. Dr. Bernal diagnosed Tucker as suffering from acute gastritis probably secondary to depression, hypopotassemia and depression from being in prison.

In late August 1987, Tucker was transferred to the Illinois Department of Corrections. During his incarceration in the state penal system, Tucker had numerous examinations by physicians between 1987 and 1990. In four of his annual examinations, no mention in the medical notes was made of Tucker's hand or rib injuries. In a Medical Orientation Appraisal on November 3, 1989, Tucker reported his rib and hand injuries as "major injuries." On August 28, 1992, Dr. Richard Easton, Jr. ("Dr. Easton") noted that Tucker had a right side protrusion of the rib cage. Based solely on Tucker's statements, and not as a result of his examination, Dr. Easton noted that this was possibly from an inadequately treated rib fracture. Dr. Easton's exam also found a deformity of the right hand and stenosis of the third and fourth flexor tendons. No treatment of either condition was recommended in August 1992. Dr. Easton noted, "There is no evidence on the X-ray of a current or old fracture. That does not mean that he did not sustain a fracture back then. He may well have." In addition, the doctor noticed "very small, obvious bone-like fragments near the head of the third metacarpal bone, which is on the hand."

According to Dr. Easton, the deformity of Tucker's hand is caused by a condition known as Dupuytren's Contracture. Dr. Easton testified that the medical texts that he consulted state that the cause of Dupuytren's Contracture is not known. He also testified that the disease is not believed to be related to trauma. In addition, Dr. Potaczek, an orthopedic surgeon, stated that there is no evidence of a fracture in Tucker's hand. According to Dr. Potaczek, the change in the third metacarpal could be related to trauma or arthritis.

Radiological interpretation of x-rays of Tucker's rib cage, taken on July 1, 1993, identify no abnormality of the ribs. But according to Dr. Easton, the radiologist's reading is consistent with a broken rib. Dr. Easton stated that, while unusual, it is possible that the protrusion of Tucker's ribs is a congenital defect but he stated that it is much more likely the result of an injury from trauma. But Dr. Potaczek testified that based on Tucker's comments, he believes the rib deformity to be post-traumatic and that whether or not he had been treated, Tucker's ribs would have healed as they did. Dr. Easton recommends no treatment of the hand or ribs at this time.

### Telephone Access/Tapping

According to Tucker, during the booking process, he requested an opportunity to call his wife or his brother and that request was denied. Defendants claim that Tucker refused the opportunity to place a phone call. According to Tucker, he was not allowed to make an outgoing telephone call for 63 hours. Defendants admit that at the request of the investigating officer who brought a detainee in, calls may be delayed for purposes of the investigation, but inmates were allowed the opportunity to make a notification of detention call.

Tucker claims that he requested a telephone call from Speenburgh on November 10, 1986, but was refused. Speenburgh denies this statement and asserts that he provided Tucker the opportunity to place a phone call following Tucker's return from bond call that day. Tucker's telephone log shows calls made or received by Tucker on November 11, 12, and 13, 1986. Each log entry has Tucker's signature attached. Tucker disputes the log records. Tucker testified and the log indicates that he spoke with a Reverend Frezza by telephone on November 11, 1986. Tucker testified that he received many telephone calls after the first four days and didn't have a problem getting the calls. Tucker saw his first visitor on November 12, 1986, which was the jail's first visiting day following Tucker's incarceration.

Max Peterson ("Peterson"), Kendall County Public Defender, was appointed to represent Tucker in the fall of 1986 and he appeared in court on Tucker's behalf within a

day or two of Tucker's incarceration at a bond hearing. Peterson cannot recall Tucker complaining to him about the lack of telephone access.

Peterson warned Tucker orally and in writing not to discuss his case with anyone, including police officers and in particular, fellow prisoners. He also wrote that the telephone line was being taped. According to Peterson, sometime in the early 1980's during the terms of former Sheriff Victor Franz, Communications Officer Brian Parker ("Parker") had told him that a taping mechanism was in use in the jail and that calls were being taped.

Peterson has no direct knowledge of any taping of inmate calls. Peterson does not recall whether he told any other clients about the possibility of taping of calls. Neither Tucker nor Peterson raised the taping issue with the Judge presiding over Tucker's criminal trial nor was any such evidence introduced. Peterson testified that the concern he had over the possibility of taping of telephone calls had no impact upon his representation of Tucker because the two would meet in person rather than talk on the telephone. Tucker claims that this situation impaired him in preparing his defense.

Defendants claim that the jail did not have the equipment or technical capability by which to tape inmate telephone calls. According to Defendants, in 1986 and 1987, the only telephone units with taping capability were the three telephones in the communications center which were in an area separate from the jail and inaccessible to inmates. In addition, the Kendall County 911 Center Director Theresa Podschweit, who was communications center supervisor in 1986, claims that she is unaware of any time that the Kendall County State's Attorney requested the taping of phone calls and that she was never asked to tape Tucker's calls. Defendants state that no officer of the Kendall County jail ever intentionally or unintentionally monitored an inmate telephone conversation in this manner.

### Prison Conditions

Kendall County jail was a small, 14–bed, century-old facility directly supervised by Speenburgh. The jail had two cells downstairs and three cells upstairs, which had toilet and shower facilities, and were capable of holding six inmates on each floor. In addition, there was one smaller cell upstairs, nicknamed the "juvenile" cell, which had toilet, but no shower facilities, and which was capable of holding two inmates. Defendants claim that no one cell was considered better than any other cell and that there was no cell that was generally not used.

Tucker claims that he was moved to the "juvenile" cell only after having complained about the possible taping of calls. On December 3, 1986, three people were confined in the jail. Tucker claims that after speaking with Speenburgh about the telephone monitoring, he was moved from a lower cell with two other jail residents to the "juvenile" cell by himself. Speenburgh denies that such a move was made out of retaliation but rather for the following three reasons: (1) Tucker complained about being in a cell with younger inmates, (2) Tucker complained about being in a cell with a black inmate, and (3) Tucker requested placement in a cell alone, so that he could prepare for his court case.

The "juvenile" cell, which measured 9' × 12'11", was ordinarily the last cell used in the jail, after the six beds on the first floor and the six beds on the second floor were filled. Defendants state that use of this cell would be allowed at an inmate's request. The cell door was composed of thick slats of flat steel woven closely together. It was the only cell that did not have access to a shower, its own heater, or any "bullpen" area outside the bunk area.

Tucker claims that every day he requested to be moved out of the cell into a cell downstairs because the cell lacked a shower and was freezing during the wintertime. According to Tucker, he was held in what he termed the "juvenile" cell for 67 consecutive days. But according to Defendants' Jail Security/Safety Inspection Reports, he was moved from cell to cell during this period of time and spent only nine days in the "juvenile" cell at intermittent periods. Tucker disputes that these records of inmate movement are complete or accurate. When Tucker was in

the lower cell, he could shower anytime that he wanted. When he was in the "juvenile" cell, Defendants claim that Tucker could still shower approximately once a week. Tucker also walked around with a blanket draped over his shoulders because of the cold in the cell. When Tucker complained about how cold it was in the upper cell, Speenburgh placed a space heater just outside of Tucker's cell. The space heater was eventually removed at the suggestion of a Fire Marshall because it was throwing sparks. Tucker was also given an extra blanket but Speenburgh took it away from him two days later stating that it was against the rules to have more than one blanket. Speenburgh also claims that he gave Tucker longjohns to wear.

The jail also became extremely hot and humid in the summertime. The Defendants state that they allowed the use of portable fans and also installed exhaust fans in the summer of 1987 to assist in air movement. During this period of time, Tucker experienced rashes, ear infections and vomiting spells. Defendants deny any correlation between the heat and Tucker's illnesses. Tucker complained about a lack of food at the jail and states that while there he lost over 20 pounds. Defendants claim that an adequate quantity and quality of food was provided and there was no record of Tucker's weight when he entered the jail so that his lost weight cannot be proven.

Tucker was allowed to receive reading materials from Reverend Frezza and from his wife. It is disputed whether Tucker properly received certain amenities including a razor, nail clippers, and a toothbrush or was allowed access to reading materials or television. Tucker also complained that he did not get enough to eat. In response, Speenburgh gave inmates cookies and milk, as well as other snacks. Tucker disputes that such snacks were provided every time he complained or that this additional food adequately supplemented his diet. Tucker's medical progress notes dated October 13, 1987, state that Tucker told Dr. Bernal he had lost 40 pounds. The notes state that Tucker claimed the weight loss was "all due to nerves" but Tucker denies having made such a statement. Dr. Bernal diagnosed the weight loss as probably due to depression from being imprisoned. The progress notes from April 27, 1988 show that Tucker attributed his weight loss to the fact that there was no cook and the notes on June 7, 1991 attribute the weight loss to a "lack of medical care." Tucker denies having made either of these statements.

Kendall County jail failed its state inspection on September 29, 1986. On October 17, 1986, a Grand Jury which inspected the jail reported that it found the facility to be in excellent sanitary condition, and found inmates were provided clean and wholesome food and proper bedding in sufficient quantities, and that inmates were kindly treated by the Sheriff and his assistants and that they were furnished with proper medical aid.

## DISCUSSION

### Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering such a motion, the court must view all inferences in the light most favorable to the nonmoving party. *See Regner v. Chicago*, 789 F.2d 534, 536 (7th Cir.1986).

### The Qualified Immunity Standard

The doctrine of qualified immunity represents a balance between the social costs of allowing suit against government officials versus the right of individuals to seek redress from those who have harmed them. *See Harlow v. Fitzgerald*, 457 U.S. 800, 814, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). In establishing a standard which encompasses such competing values, the United States Supreme Court in *Harlow* held that "[r]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and may permit the resolution of many insubstantial

claims on summary judgment." *Id.* at 818, 102 S.Ct. at 2738. This standard takes into account the fact that if the law at the time of the alleged offense was not clearly established, "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

Government officials will be shielded from liability for damages when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. In the Seventh Circuit, the phrase "clearly established" means that the "right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir.1987) *quoting Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986). Until this right has been sufficiently particularized to "put potential defendants on notice that their conduct is unlawful," the right will not be deemed established. *Id.* The acts of which Tucker complains occurred in 1986, and so we will address any constitutional violations which may have occurred in light of the established law at that time. With this high threshold in mind for overcoming summary judgment motions in the qualified immunity setting, we will proceed to Tucker's three claims.

### Medical Treatment

■ First, Tucker asserts that his civil rights were violated because he was not given adequate medical treatment while in the Kendall County jail. In the Seventh Circuit, the standard imposed upon state officials for providing medical care to pretrial detainees is one of "deliberate indifference." *Salazar v. Chicago,* 940 F.2d 233, 238 (7th Cir.1991); *Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Tort law negligence, gross negligence or recklessness does not meet the

"deliberate indifference" standard; rather, the standard requires intentional or criminally reckless conduct, implying culpable knowledge by the offender. *Salazar,* 940 F.2d at 238; *Duckworth,* 780 F.2d at 652–53.

■■ In the context of the 8th and 14th Amendments, the question that must be asked to establish the "deliberate indifference" standard is: "Is the act punishment?" *Salazar,* 940 F.2d at 240. If the act is meant to be punishment, then the standard has been met and the state official should be liable for his actions despite any claims of qualified immunity. *Id.* An additional requirement for a claim of "deliberate indifference" is that the inadequately treated injury must have been "serious." *Estelle,* 429 U.S. at 105, 97 S.Ct. at 291.

In *Matzker v. Herr,* 748 F.2d 1142, 1147 (7th Cir.1984), the plaintiff pretrial detainee had allegedly suffered a broken nose, three broken teeth, and an injured eye in an attack by other inmates. Matzker told jail authorities about his injuries, but they did not bother to treat those injuries for three months. *Id.* Thus, the jail authorities knew that Matzker had sustained serious injuries, yet ignored those injuries. *Id.* The Seventh Circuit held that Matzker's claim met the "deliberate indifference" standard. *Salazar,* 940 F.2d at 240.[1]

By contrast, *Salazar* presented the opposite situation in which a drunk driver was arrested at the scene of an accident and was taken directly to prison after refusing to be examined by paramedics. 940 F.2d at 235. In the prison cell, Salazar exhibited strange behavior such as lying on the floor but the officers attributed this behavior to his drunkenness. *Id.* at 236. A few hours later, he had died in his cell from an internal injury that was not outwardly visible to others. *Id.* The court held that the officers had not met the "deliberate indifference" standard because they had no reason to know of the plaintiff's internal injury and the plaintiff had not complained about it to them. *Id.* at 241.

---

**1.** It should be noted that the court in *Matzker* refused to even apply the deliberate indifference standard in that case and instead used a more lenient standard of care to find the defendant liable. However, a later Seventh Circuit decision held that even if the court in *Matzker had* used a "deliberate indifference" standard, Matzker would still have prevailed because the state official's actions under the facts of that case were criminally reckless. *Salazar,* 940 F.2d at 240.

In order to determine whether Randall and Speenburgh are protected by the qualified immunity doctrine, we must establish whether their actions amounted to a violation of the "deliberate indifference" standard. *Salazar*, 940 F.2d at 238; *Duckworth*, 780 F.2d at 652–53. Our task becomes more complicated when we attempt to decipher the facts which have been established from the lengthy 12(m) and 12(n) statements submitted by the parties. Of course, we are aware that the disputed facts must be viewed in the best light for Tucker. But, we are mindful also, that the Seventh Circuit has stated: "[w]e accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in [plaintiff's] favor. We do not, however, ignore facts alleged in the complaint that undermine [plaintiff's] claim nor do we assign any weight to unsupported conclusions of law." *Crane v. Logli*, 992 F.2d 136, 138 (7th Cir.1993).

Tucker's initial injuries occurred in a bar fight prior to his detention in the Kendall County jail. Before being brought to Kendall County, Tucker was brought to a hospital for treatment. The doctor who treated him at the time did not find any broken bones or internal injuries. After diagnosing his condition as "blunt trauma", the doctor sent instructions with Tucker to Kendall County that allowed for Tucker to receive ice and aspirin for a few days. Assuming that the prison officials in Kendall County saw these instructions, as we must under this standard, we must then determine whether failure to give further treatment to Tucker violated his constitutional rights.

We find this case most similar to the facts in *Salazar* as well as another Seventh Circuit case, *Davis v. Jones*, 936 F.2d 971 (7th Cir. 1991). The prison officials were aware that Tucker had already been seen and treated by a hospital doctor. He was not admitted for serious injuries, was not given any prescription medications to take, nor was he displaying any obvious signs of serious injury. We must ask: would a reasonable person believe that Tucker's injuries created a serious or life threatening risk of needless pain or lingering disability if not treated at once? *Id.* at 972.

In *Davis*, the defendant suffered a scraped elbow and a cut in his temple when he was arrested. The police did not give Davis immediate medical attention. The Seventh Circuit stated in *Davis*:

> Just as the Constitution does not demand that police obtain medical care for prisoners whose injuries appear to be slight but turn out to be serious, so the officers must obtain medical care when the wound reasonably appears to be serious even if the risk turns out to have been small. Police can only act upon appearances; anything else is gambling with another person's life, a wager the Constitution does not permit arresting officers to undertake. Whether the injury is actually serious is a question best left to a physician.

*Davis v. Jones*, 936 F.2d 971, 972 (7th Cir. 1991).

In contrast, Tucker was immediately given medical attention. He was transported to the hospital even prior to booking at the Kendall County Jail. Upon arrival, he did not complain of his injuries to the booking officer. The hospital doctor who treated Tucker did not treat the injuries as serious or life threatening in that he did not admit Tucker, did not prescribe prescription pain reliever, did not require that he see a specialist. Instead, he gave standard instructions to take aspirin if needed and to put ice on the swelling. Even if the Kendall County jail officials failed to administer the aspirin and the ice, we cannot see how this rises to the level required to establish deliberate indifference. It was not patently unreasonable for the officials to view the injuries and the lack of serious medical treatment and conclude that Tucker was not in a life-threatening or serious risk situation. As the Seventh Circuit stated in *Davis*:

> *Matzker* and *Martin* stress that the due process clause requires treatment only for *serious* wounds—those that may be life threatening or pose a risk of needless pain or lingering disability if not treated at once. No reasonable person would believe that a one-inch cut presents such a risk unless the injured person is a hemophiliac.

\*   \*   \*   \*   \*   \*

To say that deferring medical treatment for a superficial cut supports this verdict is to say that *every* claim of deferred medical care should be sent to a jury—which as in this case may choose to award punitive damages even though it believes the wound did not need care!

\*　\*　\*　\*　\*　\*

Anyway, Davis's recovery depends on an objective approach: the question is not "what was in the officers' heads but how things should have appeared to competent officers.

*Davis*, 936 F.2d at 972–73.

We find that it was quite reasonable for the Kendall County jail officials to view Tucker's injuries and conclude that they were not serious. We find their belief even more reasonable in light of the fact that Tucker was already treated for his injuries by a doctor. Therefore, even the delay in having the injuries viewed again in January does not rise to the level of deliberate indifference because there is no evidence to support the inference that a reasonable person would have viewed the injuries and found them to be life threatening or serious.

### Telephone Access/Taping

■ Tucker alleges that he was denied access to the telephone for the first 67 hours of his incarceration. In order to determine whether this denial of access constituted a constitutional violation, we must look to the "clearly established" law in 1986 when the alleged violation occurred. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. At that time, the courts had found two areas in which denial of phone access produced a constitutional violation: (1) where it significantly affected the detainee's ability to receive calls from his attorney and to prepare his defense, *Feeley v. Sampson*, 570 F.2d 364, 374 (1st Cir.1978), and (2) where telephone access was denied almost entirely or on a long term basis with no reasonable relation to a valid security interest. *Duran v. Elrod*, 542 F.2d 998, 1000 (7th Cir.1976); *Montana v. Commissioners Court*, 659 F.2d 19, 23 (5th Cir.1981). We find that neither of these two concerns were present here. Tucker's attorney represented Tucker at a bond hearing one or two days

after Tucker was incarcerated and also had a conference with Tucker at the jail within two or three days. In addition, Tucker admits that he was allowed free phone access after the fourth day of his incarceration. Under these circumstances, we do not find that the Defendants violated a "clearly established," particularized law at the time of the alleged violation that would preclude a qualified immunity defense on this issue. For this reason, we grant summary judgment on the telephone access claim.

■ Tucker also claims that his phone calls were being secretly taped. The established law of 1986 held that prison officials may tape a prisoner's telephone conversations with an attorney only if such taping does not substantially affect the prisoner's right to confer with counsel. *Dreher v. Sielaff*, 636 F.2d 1141, 1143 (7th Cir.1980). Tucker's counsel at the time of the alleged taping, Max Peterson, testified that he did not think that the taping interfered with his ability to adequately represent Tucker because he met with Tucker in person rather than using the phone. Peterson also could not recall any complaints by Tucker that the meetings in person were any less convenient than being able to use the phone. Thus, even if Tucker's allegations are true, the taping did not substantially affect his right to confer with counsel and did not constitute a "clearly established" constitutional violation in 1986. Summary judgment is therefore granted on this claim also.

### Prison Conditions

Tucker's final claim under both federal law and Illinois common law is inadequate prison conditions. To support a claim of this type, Tucker must demonstrate that the conditions he alleges deprived him of basic human needs, that they inflicted "pain without justification," or that they violated "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). The United States Supreme Court has held that comfortable prisons are not mandated by the Constitution and that restrictive and even harsh conditions "are part of the penalty that criminal

offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347–49, 101 S.Ct. at 2399–2400.

The "deliberate indifference" standard applies when the "conditions of confinement impose the punishment at issue." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. at 2399, 69 L.Ed.2d 59 (1981). As noted above, the Seventh Circuit has established that the "deliberate indifference" standard requires a mental state of intent or criminal recklessness. *Salazar*, 940 F.2d at 238; *Duckworth*, 780 F.2d at 652–53. Illinois common law likewise requires that in order to be protected by the doctrine of public official's immunity, "the actions taken must be within the scope of the official's authority and not as a result of malicious motives." *Hanzel Construction, Inc. v. Wehde & Southwick, Inc.*, 130 Ill.App.3d 196, 85 Ill.Dec. 624, 627–28, 474 N.E.2d 38, 41–42 (1985) *citing Hicks v. Williams*, 104 Ill.App.3d 172, 60 Ill.Dec. 379, 432 N.E.2d 1278 (1982).

■ Tucker asserts that the intensely cold and hot temperatures in his cell and the lack of food in the jail violated his constitutional rights. We cannot agree that these violations met the "deliberate indifference" or "malicious motives" standards so as to preclude summary judgment.

If Speenburgh possessed actual knowledge of impending harm, which could be easily preventable, so that a refusal to prevent the harm could be inferred from his actions, then Speenburgh would have acted with deliberate indifference. *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir.1985).

For example, the Seventh Circuit has found that deliberate indifference may exist in a situation where sub-zero temperatures existed and the heating system of the prison was not working so that inmates were left exposed to frigid indoor temperatures for four days. *Henderson v. deRobertis*, 940 F.2d 1055 (7th Cir.1991). In *Henderson*, even the correctional officers were working indoors with full outerwear and layers of clothing while the inmates stayed housed in the freezing cellblock. Given the fact that the prison officials never provided any temporary or alternative means of aiding the prisoners while the heat was being repaired for four days, the Seventh Circuit found that the district court erred when it found that the officers were protected by qualified immunity. *Id.* at 1060.

In the case at hand, Speenburgh made an attempt to remedy the cold temperatures by placing a space heater in front of Tucker's cell, giving him an extra blanket (if only for two days), and giving him longjohns to wear. Likewise, Defendants installed exhaust fans and opened the windows in the jail when it became too hot. Defendants also gave Tucker extra snacks on many occasions when he complained that he was hungry. These attempts to remedy the prison conditions show something less than a criminally reckless or malicious state of mind by the Defendants so that they are protected by the qualified immunity doctrine and summary judgment should be granted. .

■ Tucker also asserts that lack of more than one shower per week, and temporary deprivation of a shaving razor, toothbrush, nail clippers, newspapers and television violated his constitutional rights. Comfortable prisons are not mandated by the Constitution and restrictive and even harsh conditions "are part of the penalty that criminal offenders pay for their offenses against society." *Rhodes*, 452 U.S. at 347–49, 101 S.Ct. at 2399–2400. A state's decision to maintain at a reasonable level the quality of prison conditions rather than improve or increase its provisions of those necessities serves a legitimate purpose: to reasonably limit the cost of detention. *De La Paz v. Danzl*, 646 F.Supp. 914, 921 (N.D.Ill.1986).

The grand jury investigation of the jail found that the prison conditions were adequate and not in violation of state or federal law. Furthermore, Tucker has failed to establish that any one of the alleged deprivations was related to any "deliberate indifference" or "punishment" by the prison officials or even that they caused him any long-lasting harm. *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399. Nor do we find that the alleged deprivations are sufficiently grave to implicate the Eighth Amendment. *Caldwell v. Miller*, 790 F.2d 589, 601 (7th Cir.1986).

1248

Tucker attempts to argue that even if no one condition produced a constitutional violation by itself, the sum of these deprivations combined to produce such a violation. But the United States Supreme Court has limited such a "combination" argument to situations where "they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Thus, Tucker makes his "combination of overall conditions" argument too broadly. Just because a group of unrelated violations occurs simultaneously does not mean that they may be combined to create one constitutional violation. For this reason, Tucker's deprivation claims are barred by the qualified immunity doctrine because he does not assert any "clearly established" law at the time of the violation that would support his individual claims. Summary judgment is therefore granted for these claims.

## CONCLUSION

For the foregoing reasons, we grant summary judgment in favor of the Defendants on all counts.